951 A.2d 987

**BOARD OF EDUCATION OF THE CITY OF SEA ISLE CITY, CAPE MAY COUNTY, PETITIONER–RESPONDENT, v. WILLIAM J. KENNEDY, RESPONDENT–APPELLANT.**

Argued May 5, 2008—Decided July 21, 2008.

*Robert P. Merenich* argued the cause for appellant (*Gemmel, Todd & Merenich,* attorneys).

*Mark G. Toscano* argued the cause for respondent Board of Education of the City of Sea Isle City (*Comegno Law Group,* attorneys; *Howard E. Drucks,* on the brief).

*Michael C. Walters,* Deputy Attorney General, argued the cause for respondent New Jersey State Department of Education (*Anne Milgram,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel, *Eun S. Bae,* Deputy Attorney General, on the letter brief).

Justice LaVECCHIA delivered the opinion of the Court.

This appeal involves the interplay between the School Ethics Act (SEA), *N.J.S.A.* 18A:12–21 to –34, and *N.J.S.A.* 18A:12–2. *N.J.S.A.* 18A:12–2 prohibits board of education members from having a direct or indirect interest in any claim against their board. The SEA operates in complementary fashion. It also addresses conflicts of interest for school board members and prohibits, among other things, certain representational activities that would put a board member in a position inconsistent with that of his or her board. *See N.J.S.A.* 18A:12–24. However, the SEA contains an exemption that allows "any school official, or members of his immediate family, [to] represent[ ] himself, or themselves, in

negotiations or proceedings concerning his, or their, own interests." *See N.J.S.A.* 18A:12–24(j).

In this matter, a board member had filed a special education due process request with the State Director of Special Education Programs, *see N.J.A.C.* 6A:14–2.7(c), on behalf of his son. Relying on *N.J.S.A.* 18A:12–2's prohibition against a member having an interest in an inconsistent claim against the board, the Commissioner of Education ordered the board member's removal from office. The State Board of Education affirmed the Commissioner's determination, as did the Appellate Division. *Bd. of Educ. of Sea Isle City v. Kennedy*, 393 *N.J.Super.* 93, 106, 922 *A.*2d 805 (2007). We granted certification to consider whether a statutory conflict exists between *N.J.S.A.* 18A:12–2's statement of qualifications for board of education office and the SEA's exemption in *N.J.S.A.* 18A:12–24(j). 192 *N.J.* 478, 932 *A.*2d 29 (2007).

■ We conclude that the two statutes can, and must, be harmonized. Otherwise, an important and vital group of citizens—parents of special education pupils—might be effectively precluded from participation on local boards of education for fear that they must give up the ability to address educational issues that may arise in connection with their children's specialized programs. We hold that not all controversies and disputes that occasionally may erupt between the parents of special education pupils and local school districts concerning a child's educational program should require a sitting board of education member's removal from office. A more nuanced analysis must be undertaken when a board member's removal is sought for having pursued his or her child's due process rights to an appropriate special education program. That said, we agree with the Commissioner's determination that, in this matter, removal was necessary and appropriate because of the concrete, pecuniary aspects to the dispute between the parties. We therefore affirm the judgment of the Appellate Division, as modified by this opinion.

## I.

Petitioner William J. Kennedy (Kennedy) was elected to his first three-year term on the Sea Isle City Board of Education in 2001 and was appointed to serve as president by his colleagues on the board. His term ended abruptly when, on June 29, 2003, he resigned. Immediately thereafter, Kennedy and his spouse, individually and on behalf of their minor son, M.K., filed a request with the New Jersey Department of Education (Department) for a hearing concerning their son's special education program. *See N.J.A.C.* 6A:14–2.7. Their petition for a due process hearing was filed against the Sea Isle City Board of Education (Board), the entity responsible for providing special education services to M.K., who had been diagnosed with an autism spectrum disorder. The Kennedys' petition asserted that their son's individualized educational program (IEP) failed to satisfy his educational needs, in violation of the Individuals with Disabilities Education Act (IDEA), 20 *U.S.C.A.* §§ 1400 to 1482.[1] That litigation ended when the parties entered into a settlement agreement, which was signed on April 27, 2004.

Just prior to the parties' settlement of the IEP dispute, Kennedy again was elected, on April 20, 2004, to the Board for a three-year term to commence on April 28, 2004. As noted, on April 27th, the day before Kennedy's new term of office was to start, the Kennedys and the Board finalized the terms of the IEP settlement and signed the agreement that ended their litigation. Kennedy served on the Board uneventfully for purposes of this appeal until March 2005. However, on March 1 and 2, 2005, while he was serving again as the Board's president, Kennedy and his spouse, individually and on behalf of their son, filed two, virtually identical, letter applications requesting a due process hearing and an emergent hearing with the Department of Education, State Director of

---

[1] The IDEA requires for every special education pupil the development of an IEP that is tailored specifically to meet the individual need of the child and is reviewed annually. 20 *U.S.C.A.* § 1414(d).

the Office of Special Education Programs. *See N.J.A.C.* 6A:14–2.7.

The Kennedys' petitions broadly claimed that, through numerous acts and omissions, the Board materially breached the terms of the April 27, 2004, settlement agreement. They alleged that the Board placed their child in an abusive environment that was a direct result of, and exacerbated by, a lack of support from Board employees and behavioral consultants, contrary to what had been promised through the earlier settlement agreement.[2]

In addition to seeking emergent relief and enforcement of the settlement agreement, the Kennedys sought compensatory education for their son, extended, at-home day services, increased behavioral consultation, the provision of full support to the child's 1:1 teaching aide, the provision of behavioral supports in the current placement as contemplated in the settlement, and an award of attorneys' fees, experts' fees, costs, and disbursements. In the petitions to the State Director of Special Education Programs, Kennedy also mentioned that he served as President of the Board, but stated that he would "recuse himself from all matters relating to the school district and ... his son."

Kennedy's applications for relief prompted the Board immediately to file with the Commissioner of Education a petition of appeal seeking a declaratory ruling that the Kennedy applications created a conflict of interest with the Board that was incompatible with Kennedy's continued Board membership. The Commissioner transferred the Board's request for declaratory relief, as well as the due process applications for enforcement of the April 27, 2004, settlement, to the Office of Administrative Law where the matters

---

2 Both due process petitions stated that

[t]he [Board] has violated both the letter and [the] spirit of the Agreement through the complete disintegration of the provision of services, communication with the parents, and the proper support of the [Board's] own personnel. In short, the [Board] has created an environment that is hostile to [the child], and this environment is causing behavioral reversals.

were assigned to an administrative law judge (ALJ).[3] The ALJ issued an Initial Decision, dated May 16, 2005, finding Kennedy's conduct to be permissible pursuant to *N.J.S.A.* 18A:12–24(j) because the due process requests were designed to protect the educational rights of Kennedy's child. In his decision, the ALJ relied on an advisory opinion issued by the School Ethics Commission (SEC) in another matter, which had concluded that a disquali-

---

[3] At the request of the Board, the ALJ agreed to issue first a decision on the declaratory relief petition. The parties later resolved the due process dispute through execution of another settlement agreement in September 2005 that called for detailed actions by the Board, its staff, and contractual agents to assist in M.K.'s education, as well as the Board's payment of $15,500 to reimburse Mrs. Kennedy for services that she provided to her son, which the Kennedys claimed should have been provided by the Board. Unfortunately, the litigation between these parties did not end there.

Thereafter, on April 18, 2006, during the first year of implementation of the September 2005 settlement agreement, the Kennedys, individually and on behalf of their son, filed a seventy-one paragraph complaint in federal court against the Board seeking enforcement of the September 2005 settlement agreement. Similar to the administrative complaints that demanded enforcement of the first settlement agreement, the Kennedys requested the court to

(a) declare that the Board has materially breached and violated the [second settlement agreement];

(b) for the unfilled portions and timeframes of the [second settlement agreement], order funding for compensatory educational services necessary to redress the inadequacy of M.K.'s educational program caused by the Board's failure to comply with the [settlement agreement], in an amount to be determined at trial;

(c) compel the Board to specifically perform the [settlement agreement] for the remainder of its timeframe;

(d) order reimbursement to plaintiffs for the costs incurred by them during 2004–2005 and a portion of the 2005–2006 school year, in an amount to be determined at trial;

(e) declare and deem, both for the underlying administrative proceeding and this action, that plaintiffs are the "substantially prevailing party" for purposes of IDEA's fee-shifting provision; and

(f) grant plaintiffs leave to submit a fee application for costs and attorneys' fees.

At oral argument before this Court, the Board's attorney noted that the parties have since settled that dispute, resulting in a substantial monetary award to Kennedy's spouse. We were informed further that an attorneys' fee application for approximately $80,000, submitted by the Kennedys' counsel, remained pending.

fying conflict under *N.J.S.A.* 18A:12–2 did not arise when a parent-member of a local board of education pursued an appeal of a Section 504 determination under the Federal Rehabilitation Act of 1973. *See* 29 *U.S.C.A.* § 794(a).

In a Final Decision dated June 30, 2005, the Commissioner, however, rejected the ALJ's recommendation and held that Kennedy's actions created a disqualifying conflict of interest under *N.J.S.A.* 18A:12–2. As noted, the Commissioner's order that Kennedy be removed from office was affirmed by the State Board of Education and by the Appellate Division. *Kennedy, supra,* 393 *N.J.Super.* at 106, 922 *A.*2d 805. The Appellate Division specifically rejected Kennedy's argument that the Legislature, in creating the exemption found in *N.J.S.A.* 18A:12–24(j), impliedly repealed *N.J.S.A.* 18A:12–2. *Id.* at 105–06, 922 *A.*2d 805. The panel viewed the two statutes as operating "in separate spheres," *id.* at 106, 922 *A.*2d 805, and concluded that the exemption found in *N.J.S.A.* 18A:12–24(j) comes into operation for those board members who remain qualified as board members. *Ibid.*

## II.

Petitioner, Kennedy, asserts essentially the same arguments that he advanced below. He contends that, in enacting *N.J.S.A.* 18A:12–24(j), the Legislature clearly meant for board members to be able to represent their personal interests in "negotiations and proceedings" involving their school boards. However, by treating *N.J.S.A.* 18A:12–2 as an ongoing and absolute requirement for sitting board members, the Commissioner rendered *N.J.S.A.* 18A:12–24(j) inapplicable for board members. Therefore, petitioner claims that the administrative agency's determination defies legislative intent.

Petitioner argues that the two statutes should be construed together, which would make either of two interpretations possible. Either the later *N.J.S.A.* 18A:12–24(j) could be read to have impliedly repealed *N.J.S.A.* 18A:12–2, or the later-enacted statute could be read *in pari materia* with *N.J.S.A.* 18A:12–2, in which

case *N.J.S.A.* 18A:12–24(j) would require that his conduct be held not to constitute a disqualifying conflict of interest under *N.J.S.A.* 18A:12–2.

Taking the other tack, the Board urges deference to the agency's interpretation of its own statutes. More specifically, the Board contends that the unambiguous language of *N.J.S.A.* 18A:12–2 requires Kennedy's removal because it establishes an ongoing prohibition against conflicts of interest between a board member and the Board. The Board argues that *N.J.S.A.* 18A:12–2 serves an important preventative purpose, helping to avoid situations in which specific conflicts are likely to arise. Further, the Board argues that *N.J.S.A.* 18A:12–2 was not repealed by *N.J.S.A.* 18A:12–24(j), because the latter statute neither references the earlier statute nor purports to address the qualifications needed to maintain board membership. Accordingly, the Board urges us to affirm the determinations below, which found that *N.J.S.A.* 18A:12–2 imposes an ongoing qualification requirement for board members.

With that, we turn to the statutory provisions at issue.

## III.

### A.

Our goal when construing a statute is to discern and fulfill the Legislature's intent. *See Thomsen v. Mercer–Charles,* 187 *N.J.* 197, 206, 901 *A.*2d 303 (2006). "[C]lassic" standards guide our approach to statutory interpretation, which teach that

the intent of the drafters is to be found in the plain language of the enactment. If the language is clear, then the interpretative process will end without resort to extrinsic sources. We look to extrinsic evidence if a plain reading of the enactment leads to more than one plausible interpretation. Among the sources that inform us is the long-standing meaning ascribed to the language by the agency charged with its enforcement. In the final analysis, the polestar of the inquiry is the intent of the drafters.

[*Bedford v. Riello,* 195 *N.J.* 210, 221–22, 948 *A.*2d 1272 (2008) (citations omitted).]

■■■ Other important principles also instruct our analysis. When attempting "to discover the legislative intent, the statute must be read in light of the old law, the mischief sought to be eliminated and the proposed remedy." *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969). Also, "[a]cts in *pari materia* as well as related acts not strictly in *pari materia,* should be examined." *Ibid.* In accordance with those principles then, we begin our analysis in this statutory construction case by examining the plain language of the statute relied on by the Commissioner, *N.J.S.A.* 18A:12–2.

## B.

*N.J.S.A.* 18A:12–2, codified in a section of the school laws described as "Qualifications" for office for members of local boards of education, is titled "Inconsistent interests or office prohibited." It provides,

No member of any board of education shall be interested directly or indirectly in any contract with or claim against the board, nor, in the case of local and regional school districts, shall he hold office as mayor or as a member of the governing body of a municipality, nor in the case of county special services school districts and county vocational school districts, shall he hold office as a member of the governing body of a county.

[*N.J.S.A.* 18A:12–2.]

Thus, in rather plain language, the statute sets out clear prohibitions against board members having inconsistent claims against the board, interests in contracts with the board, and specific office-holding. Another provision, *N.J.S.A.* 18A:12–2.1, fixes a time-certain application for that qualification for office, as well as all other statutorily required qualifications.[4] Before assuming the duties of office, board members must take and subscribe to an oath that they possess all qualifications for office. *See N.J.S.A.* 18A:12–2.1. Plainly, the Legislature intended that no one be permitted to commence their service in office as a local board of

---

[4] Other statutory qualifications include requirements governing residency, citizenry, and voting conditions for office, *N.J.S.A.* 18A:12–1, and a prohibition against disqualifying dual positions, *N.J.S.A.* 18A:12–1.1.

education member without swearing that he or she meets all qualifications for office at the time of taking office.

The next logical question is whether the plain language of *N.J.S.A.* 18A:12–2's qualification for office requires immediate and automatic removal when any type of claim arises during a member's term. *N.J.S.A.* 18A:12–2 is silent about removal from office. In related provisions in Title 18A, however, the legislative answer is express and unequivocal. *See N.J.S.A.* 18A:12–3 (requiring immediate removal of sitting board member for specifically identified reasons, such as whenever board member assumes a disqualifying dual position, or ceases to be bona fide resident of district); *N.J.S.A.* 18A:12–2.2 (imposing, among other penalties, immediate disqualification from office on board members for false swearing about voter status); *N.J.S.A.* 18A:6–8 (requiring removal from office for selling textbooks, school apparatus, or supplies to district).

Against that series of clear legislative pronouncements, we find it textually uncertain whether the Legislature meant for removal of a seated school board member to be similarly absolute, and immediately required, whenever the member has an interest in any kind of claim that may arise during the course of the member's term. The Legislature certainly could have included such a requirement, because it knew how to impose immediate removal in the related statutes. *See Brewer, supra,* 53 *N.J.* at 174, 249 *A.*2d 388 (noting that "the assumption [is] that the Legislature is thoroughly conversant with its own legislation"). The Legislature also spoke clearly and forcefully in requiring no inconsistent claims as a condition for assuming office as a board member. *See N.J.S.A.* 18A:12–2; *N.J.S.A.* 18A:12–2.1. However, a qualification to assume office does not necessarily equate to a required forfeiture of office when a like issue arises during the term of a sitting member. Because neither *N.J.S.A.* 18A:12–2 nor *N.J.S.A.* 18A:12–3, the related statute establishing removal grounds, state that inconsistent claims are an automatic basis for removal, we can only conclude that some ambiguity surrounds the question.

We have no doubt that having an inconsistent claim can be additional cause for removal, but the question is whether removal is the only remedy when a board member has an interest in a claim against the board. That the Commissioner of Education, who historically has heard petitions to remove a sitting board of education member for alleged conflicts of interest, generally has concluded that the claims which have arisen have required a board member's removal does not compel the conclusion that removal is the only course of action. *See, e.g., Williams v. Ciliberto*, 96 *N.J.A.R.*2d (EDU) 991 (finding that residency and tuition dispute involving board member's grandchild resulted in disqualifying conflict of interest); *Bd. of Educ. of Hawthorne v. Taliaferro*, 94 *N.J.A.R.*2d (EDU) 197 (finding that board member had disqualifying conflict of interest in wife's civil rights and tort claims against school board).

Indeed, the Commissioner has stated his willingness to engage in fact-sensitive, case-specific analyses in respect of a member's direct or indirect interest in alleged "inconsistent" claims and contracts.

> On its face, *N.J.S.A.* 18A:12–2 mandates that no board member may serve who has filed a claim against the board of education on which he sits. Case law has further established that any such claim must be examined on a case-by-case basis in arriving at a determination as to whether the circumstances in the matter demonstrate that the board member would benefit in a substantial and material way from said claim. If so, the statute should be applied and the board member disqualified from serving on said board (citations omitted).
>
> [*Bd. of Educ. of Holmdel v. O'Connell*, 1990 *S.L.D.* 674, 680 (Comm'r of Educ.).]

Accordingly, the Commissioner's decisions examining claims by board members have discussed the relevance of determining whether the member was pursuing a claim in the public interest rather than "personal aggrandizement and enrichment," *Bd. of Educ. of Newark v. Brown*, 1984 *S.L.D.* 671, 680 (Comm'r of Educ.), *aff'd*, 1984 *S.L.D.* 683 (St. Bd. of Educ.), and such other considerations as whether the claim giving rise to the conflict of interest promised "substantial and material benefit" to the claimant. *Id.* at 681 (internal quotation marks omitted). We note

further that, in one decision, the Commissioner specifically reject-
ed the argument that *N.J.S.A.* 18A:12–2 requires automatic dis-
qualification for "any" claim against a board. *See id.* at 679, 681
(citing *Hogan v. Bd. of Educ. of Kearny*, 1982 *S.L.D.* 329(ALJ),
*aff'd*, 1982 *S.L.D.* 354 (Comm'r of Educ.) (permitting abstention to
remedy circumstances where "claim" against board involved reim-
bursement of legal fees incurred in Open Public Meetings Act
lawsuit filed by member), *aff'd*, 1982 *S.L.D.* 356 (St. Bd. of Educ.)).

In sum, we find that the Commissioner's applications of *N.J.S.A.*
18A:12–2 demonstrate a willingness to engage in a careful exami-
nation of a board member's asserted conflicting interest in a claim
against a board and, further, to find that not all claims in which a
board member has an interest constitute a "substantial conflict"
requiring removal from office as the sole remedy. However, a
great many administrative decisions in this area preceded the
Legislature's enactment of the SEA. Therefore, the guidance
provided by those earlier decisions must be enlightened further by
the later action of the Legislature that addressed conflict-of-
interest issues for local school officials.

 With enactment of the SEA, the Legislature declared its
intention "to ensure and preserve public confidence" in local school
board members, *N.J.S.A.* 18A:12–22, by providing local board
members with advance guidance on ethical conduct so that such
members might conduct their personal affairs appropriately and
within the bounds ethically expected. *N.J.S.A.* 18A:12–24(j). The
SEA considered the advocacy interests of board members and
recognized a limited need to except board members from an
absolute prohibition from pursuing their family members' interests
in "negotiations and proceedings" involving the board. Read
broadly, the later-enacted SEA could contradict *N.J.S.A.* 18A:12–
2's interest in prohibiting substantial conflicting claims that pit a
board member's interest in a claim against the interests of the
board. Implied repealers are not favored, however, and would
require that we find the later-enacted statute to be utterly incon-
sistent or repugnant to the earlier. *See Swede v. City of Clifton*,
22 *N.J.* 303, 317, 125 *A.*2d 865 (1956).

We need not do so here for the two statutes are readily capable of being harmonized. *See N.E.R.I. Corp. v. N.J. Highway Auth.*, 147 *N.J.* 223, 248–49, 686 *A.*2d 328 (1996) (explaining that every effort should be made to reconcile and harmonize statutes relating to same subject matter). The Legislature's authorization of a board member's ability to pursue resolution of some personal issues, interests, or disagreements with a school district through negotiations and even "proceedings" is not repugnant to the earlier recognition by the Commissioner that not all "claims" against a board will require disqualification and removal from office under *N.J.S.A.* 18A:12–2. We view the SEA's exemption as a legislative expansion of that previously recognized, limited case-law exception to the rule against inconsistent claims. Certainly, we perceive no direct statutory conflict between the two statutes. The reconciliation of the two statutes will unfold based on fact-sensitive analyses for substantial and deeply antagonistic interests that would call into question a board member's ability to perform public duties and the public's confidence in that ability of the member to perform his or her office, notwithstanding the advancement of a personal interest through negotiations or a "proceeding."

The Legislature's exemption allowing participation in certain "proceedings" must be taken into account by the Commissioner in removal actions based on *N.J.S.A.* 18A:12–2's prohibition against inconsistent claims. We recognize that that shall require careful case development. As a matter of fairness, the Court should provide the public with advice and guidance. The Legislature has recognized the value of such advance notice about the parameters of acceptable behavior, specifically noting that the more guidance that school board members receive, the better for them and for the public that they serve. *See N.J.S.A.* 18A:12–22; *see also N.J.S.A.* 18A:12–31 (authorizing SEC to issue advisory opinions).

We conclude that a board member should not be removed from office merely because he or she has advanced any claim "in a

proceeding" against a school district involving that individual or an immediate family member's interests. Substantial, disqualifying conflicts of interest should be identified either by type of claim, *i.e.* specific monetary claims by the member or a family member as in a tort claim, or by type of proceeding. Because, as the Legislature recognized, board member conflicts of interest can implicate the authority of both the Commissioner of Education, *see N.J.S.A.* 18A:12–30, and the SEC, the two agencies with related and overlapping authority here should consult and attempt to harmonize their approaches on these important matters. *But see N.J.S.A.* 18A:12–32 (preventing SEC from issuing advisory opinion on any matter pending before any court of law or administrative agency). Ultimately, however, the line between acceptable and prohibited activities by board members, in respect of the advancement of personal or a family member's interests in proceedings against a board of education, may be resolved through the prism of a fact-specific inquiry.

We therefore turn once again to the setting of this case. Although the instant matter is technically moot in that Kennedy's term of office is long over, the present controversy provides a vehicle through which guidance may be provided to school boards, their members, the Commissioner, and the SEC. We occasionally will decide matters where the issue is of substantial importance, likely to reoccur, but capable of evading review. *See, e.g., Mistrick v. Div. of Med. Assistance & Health Servs.,* 154 *N.J.* 158, 165, 712 *A.*2d 188 (1998); *State ex rel. J.G., N.S. & J.T.,* 151 *N.J.* 565, 575, 701 *A.*2d 1260 (1997); *Zirger v. Gen. Accident Ins. Co.,* 144 *N.J.* 327, 330, 676 *A.*2d 1065 (1996). Accordingly, we shall address the merits of this allegedly disqualifying claim advanced by Kennedy, on behalf of his son, in a special education due process hearing request against the board on which he served.

## IV.

By way of background, the delivery of special education services to handicapped children is governed by both federal and state law.

The IDEA provides federal funding to state and local agencies to assist in the education of disabled children, *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 *U.S.* 291, 295–96, 126 *S.Ct.* 2455, 2458, 165 *L.Ed.*2d 526, 533 (2006), but receipt of such funding is contingent upon a state's continued compliance with the IDEA's requirements. *See* 20 *U.S.C.A.* § 1412. As a recipient of such funding, New Jersey has enacted legislation, *N.J.S.A.* 18A:46–1 to –53, and regulations, *N.J.A.C.* 6A:14–1.1 to –10.2, to fulfill the IDEA's requirements.

A state receiving federal funding must provide a handicapped child with a free appropriate public education ("FAPE"), 20 *U.S.C.A.* § 1400(d)(1)(A). The state must assemble a child study team to develop a disabled child's IEP. 20 *U.S.C.A.* § 1414(d)(1)(B). The federal statute also requires the imposition of certain procedural safeguards for the benefit of handicapped children and their parents, available when a dispute arises between the parents of a handicapped child and a school board. *See* 20 *U.S.C.A.* § 1415. The key dispute-resolution vehicles provided are mediation or a due process hearing. *See* 20 *U.S.C.A.* § 1415(b), (e), (f).[5] Thus, "[a] handicapped child in New Jersey, ... is entitled to a panoply of rights conferred under the IDEA, its implementing regulations, 34 *C.F.R.* §§ 300.1 to –754, and the corresponding state statutes governing special education, *N.J.S.A.* 18A:46–1 to –46, and regulations, *N.J.A.C.* 6:28–1.1 to –12.1." *In re Adoption of Amendments to N.J.A.C. 6:28–2.10, 3.6 and 4.3,* 305 *N.J.Super.* 389, 396, 702 *A.*2d 838 (App.Div.1997).

Against that backdrop of particularized processes for IEP development, delivery, and dispute resolution, we consider the situa-

---

[5] *See also Bd. of Educ. of the Lenape Reg'l High Sch. Dist. v. State Dep't of Educ., Office of Special Educ. Programs,* 399 *N.J.Super.* 595, 599–600, 945 *A.*2d 125 (App.Div.2008) (noting that IDEA provides parents with additional means of seeking redress for violations of statute's benefits, including "an administrative complaint with the designated state education agency" that allows parents "to resolve differences without resort to more costly and litigious resolution through due process" (internal quotation marks omitted)).

tion of a board member who has a handicapped child. The board member's interest in the child's right to benefit from those due process rights necessitates that we give careful consideration to how special education controversies and disputes fit between the type of substantial disqualifying interest prohibited by *N.J.S.A.* 18A:12–2 and the exception provided by *N.J.S.A.* 18A:12–24(j) for advancing family member interests through proceedings with the board.

Our analysis must begin with the recognition that both board and parent are held to have a common interest in the resolution of an appropriate education for the child. *See Lascari v. Bd. of Educ. of the Ramapo Indian Hills Reg'l High Sch. Dist.*, 116 *N.J.* 30, 46, 560 *A.*2d 1180 (1989) (stating that "both the parents and the district have an interest in assuring that a handicapped child receives an appropriate education"). Indeed, this Court explained that concerns about such matters as the allocation of the burden of proof in special education proceedings have less importance because of their shared interest in getting the "right" educational programming and placement for the child. *Ibid.*

> In that setting, the adversary nature of the proceedings should yield to obtaining the right result for the handicapped child.... [W]e believe the obligation of parents at the due-process hearing should be merely to place in issue the appropriateness of the IEP. The school board should then bear the burden of proving that the IEP was appropriate.
>
> [*Ibid.*]

That burden allocation remains the same in New Jersey, notwithstanding intervening developments in federal decisional law interpreting IDEA requirements.[6] Our Legislature has opted, as a matter of our own state statutory special education requirements, to retain *Lascari's* burden allocations and to keep the burden of production and the burden of proof on the local school district whenever a due process hearing is held concerning "the

---

[6] *See Schaffer v. Weast,* 546 *U.S.* 49, 126 *S.Ct.* 528, 163 *L.Ed.*2d 387 (2005) (holding that burden of proof in due process hearing is properly on party requesting relief, but leaving open whether states could override that rule through enactment of their own requirements).

identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action, of a child with a disability." *See* *L.* 2007, *c.* 331, § 1 (codified at *N.J.S.A.* 18A:46–1.1).

The Legislature's reaction to the *Schaffer* decision reinforces that special education "disputes" are unique and deserve special consideration in light of the parties' shared goal. Moreover, it is the policy of this state to encourage less-adversarial means to resolve, efficiently and quickly, special education disagreements, by encouraging mediation of disputes. *N.J.A.C.* 1:6A–4.1 ("Upon receipt of a hearing request, the Department of Education shall promptly contact the parties to offer mediation."). As the special education scheme of complaint resolution makes clear, the joint interest of the district and parents in resolving the FAPE for a particular handicapped pupil makes these disputes particularly suited to early and efficient resolution. Board members who have handicapped children should not have to fear loss of their elected office as a condition of questioning, or if necessary pursuing through the initiation of proceedings, the appropriateness of their child's education.

Thus, for example, we are aware that disagreements between the parent of a disabled child and a school board often require multiple meetings with child study teams. Those disagreements are not the type of conflict that ordinarily should run afoul of *N.J.S.A.* 18A:12–2. They are not categorically the type of substantial conflict that the statute is intended to prevent. Indeed, we will not presume that every due process request to resolve specific issues regarding a child's classification or IEP should result in the automatic disqualification of a board member either. The Commissioner should review the claim in question to determine whether it portends the likelihood of protracted, and intractable, litigation between the parties. Enforcement issues in respect of existing IEPs should be similarly examined. Particularly because mediation may provide a possible solution to the dispute, case-specific examination should be undertaken. We

simply cannot rule out the possibility that a due process hearing request might be found to present the type of controversy that could be quickly and easily resolved between the parties.

The Commissioner should examine the nature of the dispute and establish a more careful and fact-specific explanation of when a conflict over a child's educational program becomes so substantial that removal from office is required. That said, when a due process claim includes a request for specific monetary relief, we believe that a line has been crossed and a substantial conflict between a board member and the board can be found to exist.

Such a request arose in this action where the due process petition forwarded to the State Director included a demand for payment to Kennedy's spouse for services that she had provided to her son. We cannot reconcile that claim for substantial monetary relief[7] with a board member's continued service on a local board. For that reason, we have no hesitancy in approving the relief ordered in this matter. Indeed, we note, as did the Appellate Division below, that the due process demand in issue gave rise to escalating federal litigation between the parties, which continues to date as far as we understand. Finally, we commend to the Commissioner, for her considered judgment, whether a set of guidelines might be developed so that parents of students might better understand the limits imposed on them should they choose to run for office on their local board of education.

## V.

The judgment of the Appellate Division is affirmed, as modified by this opinion.

---

[7] Here, the claim was settled for $15,500. We leave open the possibility that the Commissioner may view differently claims involving de minimis mounts in controversy.

*For affirmance as modification*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.