970 A.2d 354

CHARLOTTE KLUMB, PETITIONER–RESPONDENT, v. BOARD OF EDUCATION OF THE MANALAPAN–ENGLISHTOWN RE-GIONAL HIGH SCHOOL DISTRICT, MONMOUTH COUNTY, RESPONDENT–APPELLANT.

Argued February 17, 2009—Decided May 11, 2009.

*Patricia D. Connelly* argued the cause for appellant (*Brown & Connelly*, attorneys).

*Richard C. Swarbrick* argued the cause for respondent Charlotte Klumb.

*Melissa T. Dutton,* Deputy Attorney General, argued the cause for respondent New Jersey State Board of Education (*Anne Milgram,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel).

*Donna M. Kaye,* Senior Counsel, argued the cause for amicus curiae New Jersey School Boards Association (*Michael F. Kaelber,* Director, attorney).

*Richard A. Friedman* argued the cause for amicus curiae New Jersey Education Association (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman,* attorneys; *Mr. Friedman* and *Aileen M. O'Driscoll,* on the letter brief).

Justice LONG delivered the opinion of the Court.

More than twenty years ago, plaintiff, a public school teacher, retired from her position on a disability pension. On several occasions she requested that the Teacher's Pension and Annuity Fund (TPAF) reconsider its finding that she was disabled. Eventually, TPAF found her sufficiently recovered to return to teaching and ordered her employer to rehire her.

The employer refused and TPAF ultimately withdrew its order of reinstatement. On a challenge by the teacher, the Commissioner of Education later declared her to be legally entitled to reinstatement pursuant to *N.J.S.A.* 18A:66–40(a). That ruling was upheld by the State Board of Education and the Appellate Division.

On this appeal we are asked to interpret *N.J.S.A.* 18A:66–40(a) and to determine whether it mandates school districts to rehire a formerly disabled employee and, if so, whether there are any limits on that imperative. We hold that under *N.J.S.A.* 18A:66–40(a), a school district must return a formerly disabled teacher to the next available opening in the position that he or she held at the time of the disability retirement, so long as the teacher meets

the standards set by the State Board of Education for that position, i.e., a valid teaching certificate and endorsements.

## I.

In 1968, Charlotte Klumb was hired as an elementary school teacher in the Manalapan–Englishtown Regional School District ("District"). Starting in October 1985, Klumb requested, and was granted, several leaves of absence in order to obtain treatment for alcoholism and mental health issues. Although Klumb returned to teaching after each leave, she continued to struggle with her recovery.

The District filed tenure charges against Klumb and placed her on "voluntary sick leave disability" without pay but with benefits and agreed not to proceed with the tenure charges pending the outcome of Klumb's disability application. Klumb submitted a disability application to TPAF on April 11, 1988. The application was subsequently approved.

In early 1994, Klumb believed that she had been rehabilitated and requested that TPAF reconsider its finding that she was disabled from teaching. When TPAF denied that application she appealed. For reasons that need not be recounted here, a long delay occurred. During that period, Klumb amassed an array of medical reports demonstrating that she no longer suffered from a disability and that she was able to perform her duties as a teacher.

Based on that evidence, she renewed her request in 1998. On October 2, 1998, TPAF found that Klumb's "disability has disappeared or substantially diminished to the point that she may resume her former duties of teacher without restriction."[1] On that same day, TPAF also notified the District of its determination and ordered it to "reinstate Ms. Klumb to her former duty or any other comparable duty which may be assigned to her." The

---

[1] As a result of that ruling, Klumb's appeal from TPAF's earlier refusal to reconsider its disability determination was dismissed as moot.

District sought a hearing. TPAF again wrote to the District on December 16, 1998, and stated that the applicable statute, *N.J.S.A.* 18A:66–40, "does not address reemployment nor does it require an employer to reemploy the member." Relying on that letter, the District refused to rehire Klumb as initially ordered. Despite the District's insistence that it was not required to rehire Klumb, it agreed to interview her for an elementary school teacher position that had opened. Klumb was interviewed on March 1, 1999, but was not hired.

Klumb took no action until April 29, 2002, when she filed a complaint in the Superior Court, Law Division, Monmouth County, demanding reinstatement, effective as of TPAF's determination that she was no longer disabled, along with damages, attorneys' fees, and interest. The District thereafter moved for summary judgment. The trial judge denied the motion, and instead transferred the matter to the Commissioner of Education ("Commissioner"), ordering Klumb to exhaust her administrative remedies.

On December 22, 2004, an Administrative Law Judge (ALJ) ruled in favor of the District, concluding that *N.J.S.A.* 18A:66–40(a) does not require the rehiring of a formerly disabled teacher. On June 16, 2005, the Commissioner of Education rejected the decision of the ALJ and ruled that the statute mandates the rehiring of a formerly disabled employee. He therefore declared that the District erred in not rehiring Klumb on March 1, 1999, and ordered her reinstatement

> as of March 1, 1999, with all emoluments and back pay to which she is entitled, and to provide her with the support necessary to familiarize her with current methods and educational trends to assure [Klumb]'s seamless re-acclimation to her teaching duties and the provision of quality educational services to her students.
>
> [ (Footnote omitted).]

In ruling, the Commissioner rejected Klumb's claims for compensatory and punitive damages, attorneys' fees, and judgment interest. The District appealed and moved for a stay of the Commissioner's decision, which was denied. The State Board of Education affirmed the decision of the Commissioner regarding

Klumb's reinstatement.[2]  The District appealed to the Appellate Division.

In the interim, Klumb was rehired by the District as a seventh-grade Language Arts teacher.  However, her salary was not commensurate with her level of education and years of experience. She moved to supplement the administrative record before the State Board to include that new information.  The State Board denied the motion and directed her to seek enforcement of the Commissioner's decision in a Superior Court action.  Klumb did so, using the same docket number assigned to the original complaint that had been filed in April 2002.  The judge denied Klumb's motion and required the matter to proceed by the filing of a new complaint.  Klumb filed the complaint and the District moved to dismiss, or in the alternative, stay the proceedings pending the outcome of the appeal before the Appellate Division. The trial judge granted the District's alternative motion and stayed the matter until the appeal was resolved.[3]

In an unpublished per curiam opinion, the Appellate Division affirmed the decision of the State Board.  In particular, the panel ruled that:

> The plain language of the applicable statute, *N.J.S.A.* 18A:66–40(a), as well as the long-standing practice of the Department of Education and other agencies interpreting similar statutory language, support an affirmance of the State Board's decision ordering the [District] to reinstate Klumb. *See, e.g., In re Allen,* [262 *N.J.Super.* 438, 440–41, 621 *A.*2d 87 (App.Div.1993)] ("We hold that a public employee who returns from a disability retirement because his [or her] disability

---

[2] Klumb did not cross-appeal the denial of damages, counsel fees, and interest.

[3] Klumb proceeded in arbitration pursuant to the terms of the collectively negotiated agreement between the New Jersey Education Association (NJEA) and the District.  Through arbitration, Klumb sought an increase in her salary to reflect the years during which she taught in the District prior to leaving on disability.  The arbitrator found in Klumb's favor, ordering the District to place Klumb on the proper "step" on the pay scale and awarding her back pay for the years she was underpaid, beginning in 2005.  The arbitration award was confirmed and the District has appealed both the arbitrability of the matter and the arbitrator's decision.  Those appeals are currently pending before the Appellate Division.

ceases should, to the extent possible, be reinstated to his [or her] former position and be given full credit for … prior service.") …. This reasoning is equally applicable here.
[ (Third, fourth, and fifth alterations in original).]

We granted the District's petition for certification, 196 *N.J.* 600, 960 *A.*2d 395 (2008), and now affirm.

## II.

The District argues that the plain language and legislative history of *N.J.S.A.* 18A:66–40 demonstrate that: the Legislature did not intend to require reinstatement at all, and in no event beyond five years; agency interpretations and prior case law support its position; school districts need discretion in personnel decisions to ensure that students are receiving the best education; interpreting the statute to require reinstatement would result in a larger drain on the public fisc, an outcome the Legislature could not have desired; and alternatively, any back pay award is subject to proof of mitigation of damages. Those arguments are supported by amicus New Jersey School Boards Association.

Klumb counters that the Commissioner properly applied the law and that the statute requires reinstatement; the administrative and judicial decisions interpreting *N.J.S.A.* 18A:66–40(a) and similar statutes are correct and dispositive in this case; and *N.J.S.A.* 18A:66–40(a) does not place a limit on the requirement to rehire previously disabled employees. Her arguments are echoed by the State Board and amicus New Jersey Education Association.

## III.

When interpreting a statute, our main objective is to further the Legislature's intent. *Bd. of Educ. of Sea Isle City v. Kennedy*, 196 *N.J.* 1, 12, 951 *A.*2d 987 (2008) (citing *Thomsen v. Mercer–Charles*, 187 *N.J.* 197, 206, 901 *A.*2d 303 (2006)). To discern the Legislature's intent, courts first turn to the plain language of the statute in question. *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citing *Lozano v. Frank DeLuca Constr.*, 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004)). In reading the

language used by the Legislature, the court will give words their ordinary meaning absent any direction from the Legislature to the contrary. *Serv. Armament Co. v. Hyland,* 70 *N.J.* 550, 556, 362 *A.*2d 13 (1976) (citing *Safeway Trails Inc. v. Furman,* 41 *N.J.* 467, 487, 197 *A.*2d 366, *cert. denied,* 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964)). "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." *Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 192 *N.J.* 189, 195, 927 *A.*2d 543 (2007) (citing *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039).

Where the plain meaning does not point the court to a "clear and unambiguous result," it then considers extrinsic evidence from which it hopes to glean the Legislature's intent. *Bedford v. Riello,* 195 *N.J.* 210, 222, 948 *A.*2d 1272 (2008) (citing *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039). Included within the extrinsic evidence rubric are legislative history and statutory context, which may shed light on the drafters' motives. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000) (citing *Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999)). Likewise, interpretations of the statute and cognate enactments by agencies empowered to enforce them are given substantial deference in the context of statutory interpretation. *Matturri v. Bd. of Trs., Judicial Ret. Sys.,* 173 *N.J.* 368, 381, 802 *A.*2d 496 (2002) (citing *R & R Mktg., LLC v. Brown–Forman Corp.,* 158 *N.J.* 170, 175, 729 *A.*2d 1 (1999)).

> Even when the language of the statute is ambiguous and
>> the Legislature has not addressed the precise question of statutory meaning, [we]
>>> may not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> [*Id.* at 381–82, 802 *A.*2d 496 (alterations in original) (quoting *Kasper v. Bd. of Trs., Teachers' Pension and Annuity Fund,* 164 *N.J.* 564, 581, 754 *A.*2d 525 (2000)).]

Additionally, the fact that the Legislature has not acted in response to an agency's interpretation or practice is "granted great

weight as evidence of its conformity with the legislative intent." *Malone v. Fender*, 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979) (citing *Lavitz v. Civil Serv. Comm'n*, 94 *N.J.Super.* 260, 266, 227 *A.*2d 722 (App.Div.1967)); *see also Cedar Cove, Inc. v. Stanzione*, 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991) ("The meaning ascribed to legislation by the administrative agency responsible for its implementation, including the agency's contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment." (citing *Malone, supra*, 80 *N.J.* at 137, 402 *A.*2d 240)).

Further, where judicial interpretations of the statute are deeply ingrained in our jurisprudence, "[t]he Legislature's failure to modify a judicial determination, while not dispositive, is some evidence of legislative support for the judicial construction of a statute." *Mass. Mut. Life Ins. Co. v. Manzo*, 122 *N.J.* 104, 116, 584 *A.*2d 190 (1991) (citing *White v. Twp. of N. Bergen*, 77 *N.J.* 538, 556, 391 *A.*2d 911 (1978)).

Regardless of the materials relied upon and the analytical tools employed, in the final analysis, courts should "seek to effectuate the 'fundamental purpose for which the legislation was enacted.'" *Schad, supra*, 160 *N.J.* at 170, 733 *A.*2d 1159 (quoting *N.J. Builders, Owners & Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972)).

With that as a backdrop, we turn to the words of the statute. *N.J.S.A.* 18A:66–40(a) states:

> Once each year the retirement system may, and upon his application shall, require any disability beneficiary who is under the age of 60 years to undergo medical examination by a physician or physicians designated by the system for a period of 5 years following his retirement in order to determine whether or not the disability which existed at the time he was retired has vanished or has materially diminished....
>
> . . . .
>
> If a disability beneficiary, while under the age of 60 years, refuses to submit to at least one medical examination in any year by a physician or physicians designated by the system, his pension shall be discontinued until withdrawal of his refusal. *If the report of the medical board shall show that such beneficiary is able to perform either his former duty or other comparable duty which his former employer is*

*willing to assign to him, the beneficiary shall report for duty; such a beneficiary shall not suffer any loss of benefits while he awaits his restoration to active service.* If the beneficiary fails to return to duty within 10 days after being ordered so to do, or within such further time as may be allowed by the board of trustees for valid reason, as the case may be, the pension shall be discontinued during such default.

[ (Emphasis added).]

Klumb's argument is that the statutory language mandates reemployment. The District counters that the statute is discretionary—that is, the employee must make herself available, but the school district is free to rehire her or not, as it sees fit. Both views are rooted in the words of the statute. Klumb's interpretation is bolstered by the requirement that the employee "report for duty" and that he not lose benefits "while he *awaits his restoration* to active service." *N.J.S.A.* 18A:66–40(a) (emphasis added). The District's view is supported by the fact that, although the statute requires the employee to "report for duty," *ibid.*, it places no concomitant obligation on the school district. We view the language as ambiguous and therefore look outside it for clues to its meaning.

## IV.

A brief history of the statute is our starting point. The predecessor to *N.J.S.A.* 18A:66–40 was enacted in 1955. *L.* 1955, *c.* 37, § 40. That statute provided for an annual medical examination of a disability retiree under the age of sixty, at the behest of TPAF. It also allowed the retiree to apply to be restored to active service and stated that "[u]pon application to the employer by whom he was employed at the time of his retirement, any beneficiary, while under the age of 60 years, may, *in the discretion of the employer, be restored to active service.*" *Ibid.* (emphasis added).

The 1966 version of the statute [4] continued, verbatim, the discretionary language of 1955 in connection with an employee's applica-

---

[4] The statute was amended in 1956, but those amendments do not touch on the issue before us.

tion for reinstatement. That version also continued the requirement of annual medical evaluations if demanded by TPAF and added the following language:

> If the report of the medical board shall show that such beneficiary is able to perform either his former duty or other comparable duty which his former employer is willing to assign to him, the beneficiary *shall report for duty*. [*L.* 1966, *c.* 66, § 3 (emphasis added).]

Two years later in 1968, the Legislature amended the statute again. The amended statute required a disabled beneficiary under the age of sixty to report to the New Jersey Rehabilitation Commission for a determination of whether he "could be rehabilitated to perform either his former duty or other comparable duty." *L.* 1968, *c.* 228, § 7. If the Rehabilitation Commission determined that a beneficiary could be rehabilitated, the beneficiary was required to follow the rehabilitation program. *Ibid.* Thereafter, if the medical board determined that the beneficiary was able to perform his former duty, the beneficiary was required to "report for duty" and the former employer was "*obligated* to provide him with a position." *Ibid.* (emphasis added). If the medical board concluded that the beneficiary could not perform his former duty but could perform a comparable job, reinstatement was discretionary. *Ibid.*

Except for the new Rehabilitation Commission provision, the 1968 statute tracked the 1966 version substantively but added: "[S]uch a beneficiary shall not suffer any loss of benefits while he awaits his restoration to active service." *Ibid.* The 1968 version also continued the earlier discretionary language:

> e. On and after June 9, 1971, upon application to the employer by whom he was employed at the time of his retirement, any beneficiary, while under the age of 60 years, may, *in the discretion of the employer, be restored to active service*. [*Ibid.* (emphasis added).]

The statute was last amended in 1971 to eliminate the Rehabilitation Commission provision. *L.* 1971, *c.* 121, § 21. Except for renumbering the "report for duty" and "while he awaits restoration to active service" section, the language of the 1971 statute generally replicated the 1968 version. However, the Legislature added a five-year limitation on requiring beneficiaries to submit to

medical examinations and dropped subsection (e) of the former statute altogether. Thus, the discretionary language that had been in the statute since 1955 was deleted. That is the version of the statute that is in effect today.

Each side argues that the linguistic changes in the statute over the years signal support for its view. On one hand, the complete elimination of the discretionary language that had been in the statute since 1955 renders the words "report for duty" and "while he awaits his restoration to active service" powerful signals of the Legislature's intent to make reinstatement mandatory. On the other hand, the Legislature plainly knew how to use mandatory language as evidenced by the earlier version of the statute and other pension statutes,[5] but did not use it here, thus supporting the view that it intended reinstatement to be discretionary. We are no more enlightened regarding the intent of the Legislature by the language changes in the statute over time than by the words of the statute itself. In short, discerning the meaning of the statute requires further inquiry into other extrinsic evidence.

## V.

That brings us to administrative agency interpretations of *N.J.S.A.* 18A:66–40(a), which must be given substantial weight in

---

[5] For example, *N.J.S.A.* 43:7–12 governing disability pensions for prison officers and employees contains the following language:

> The commission may require any member who is less than 55 years of age ... to submit to a physical examination twice a year for a period of 3 years and once a year thereafter in order to determine whether or not the disability which existed at the time that he was retired still exists.... If the physicians or surgeons or a majority of them report that the member is able to perform either his former usual duties, if such be available, or such other available duties, ... the pensioner *shall report for such duty within 10 days after receipt of notice of the commission's determination thereon, and be reinstated to duty at the salary prevailing for his former position at the time of his reinstatement and thereupon his pension payments shall cease.*
>
> [(Emphasis added).]

Similar language can be found in the statute governing disability pension benefits for police officers and firefighters appointed prior to July 1, 1944. *N.J.S.A.* 43:16–2.

an interpretative calculus. In that analysis, we also consider administrative agency and judicial interpretations of identical and similarly worded legislation.

## A.

The Commissioner of Education has, on several occasions, expressed an official position on the interpretation of *N.J.S.A.* 18A:66–40(a) and whether that statute creates a right to reinstatement. In 1977, in *Laing v. Board of Education of Edison,* 1977 *S.L.D.* 422 (Comm'r of Educ.), *aff'd,* 1978 *S.L.D.* 1025 (App.Div.), and in 1982 in *School District of Newark v. Kopel,* 1982 *S.L.D.* 17 (ALJ), *aff'd,* 1982 *S.L.D.* 24 (Comm'r of Educ.), the Commissioner, construing *N.J.S.A.* 18A:66–40(a), held that "[t]he determination of the TPAF to reinstate [a pension beneficiary as an active member] in its pension fund does not give rise to an automatic reinstatement of [the beneficiary] as a teacher." *Laing, supra,* 1977 *S.L.D.* at 427; *see also Kopel,* 1982 *S.L.D.* at 21, 24.

Twelve years later, in *Bublin v. Board of Education of Point Pleasant,* the Commissioner revisited the issue and the legal landscape changed. 96 *N.J.A.R.*2d (EDU) 768, 774 (Dep't of Educ.) (referencing Commissioner of Education's prior unpublished opinion in same matter issued on January 26, 1994). *Bublin* involved a teacher who was hired as an elementary school librarian but during her employment was assigned to the school district's high school to teach English for the 1981–82 school year. *Id.* at 769. In 1982, she retired as a result of a disability and began receiving disability benefits. *Ibid.* More than eight years later, TPAF determined that Bublin was no longer disabled and could return to teaching. *Ibid.* At that time there were no open positions for English teachers or librarians in the school district. *Ibid.* The following year Bublin applied for an elementary school librarian position with her former employer. *Ibid.* When she was not hired, she appealed to the Commissioner. *Ibid.*

The Commissioner ruled that the interpretations of cognate pension provisions by the Appellate Division had persuaded him

that *Laing* and *Kopel* had been wrongly decided and that Bublin was legally entitled to reinstatement to her position as an English teacher pursuant to *N.J.S.A.* 18A:66–40(a). *Bublin, supra,* 96 *N.J.A.R.*2d at 769. In connection with that holding, he added that the school district was not required to create a new position or "bump" an incumbent; Bublin was entitled to the next opening. *Id.* at 774. Further, under the statute, the Commissioner held that Bublin had no right to a different position; when considering a disabled employee for a job other than the job the employee held at the time of retirement, school districts have discretion to rehire that employee. *Ibid.* The Commissioner's holding in *Bublin* remains the Department of Education's official interpretation of *N.J.S.A.* 18A:66–40(a).

### B.

As far as our research reveals, TPAF has never weighed in on this issue before this case. Here, the agency appears to have come down on both sides of the question, first ordering Klumb to be reinstated, and then declaring that "[t]he statute does not address reemployment nor does it require an employer to reemploy a member." The most that can be said of that state of affairs is that, unlike the Commissioner of Education, TPAF has not developed a consistent administrative position on the subject.

We note, however, that the boards of other pension systems within the Division of Pensions and Benefits of the Department of Treasury have interpreted statutes identical, or very similar, to *N.J.S.A.* 18A:66–40(a) in accord with the Department of Education's long-standing interpretation.

For example, the statute detailing reexamination and reemployment under the Public Employees' Retirement System (PERS) provides in relevant part:

> Once each year the retirement system may, and upon his application shall, require any disability beneficiary who is under the age of 60 years to undergo medical examination by a physician or physicians designated by the system for a period of 5 years following his retirement in order to determine whether or not the

> disability which existed at the time he was retired has vanished or has materially diminished. . . .
>
> . . . If the report of the medical board shall show that such beneficiary is able to perform either his former duty or other comparable duty which his former employer is willing to assign to him, the beneficiary shall report for duty; such a beneficiary shall not suffer any loss of benefits while he awaits his restoration to active service. If the beneficiary fails to return to duty within 10 days after being ordered so to do, or within such further time as may be allowed by the board of trustees for valid reason, as the case may be, the pension shall be discontinued during such default.
>
> [*N.J.S.A.* 43:15A–44(a).]

That statute, which was originally enacted in 1954, has been interpreted by PERS as standing for the proposition that when an employee leaves his position as a result of a disability and is later rehabilitated, the former employer must rehire him. *See, e.g., Twp. of Dover v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 92 *N.J.A.R.*2d (TYP) 83, 85 (Div. of Pensions & Benefits) (adopting agency's argument that *N.J.S.A.* 43:15A–44 requires reinstatement).

The statute governing those same matters within the Police and Firemen's Retirement System (PFRS) is very similar to the one before us and provides, in relevant part:

> Any beneficiary under the age of 55 years who has been retired on a disability retirement allowance under this act, on his request shall, or upon the request of the retirement system may, be given a medical examination and he shall submit to any examination by a physician or physicians designated by the medical board once a year for at least a period of 5 years following his retirement in order to determine whether or not the disability which existed at the time he was retired has vanished or has materially diminished. If the report of the medical board shall show that such beneficiary is able to perform either his former duty or any other available duty in the department which his employer is willing to assign to him, the beneficiary shall report for duty; such a beneficiary shall not suffer any loss of benefits while he awaits his restoration to active service.
>
> [*N.J.S.A.* 43:16A–8(2).]

Like PERS, PFRS appears to have construed that language to mandate reinstatement. *Valos v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 94 *N.J.A.R.*2d (TYP) 156, 159 (Div. of Pensions & Benefits) (interpreting statute as requiring reinstatement but adopting agency position that relief was not available to beneficiary because he retired prior to receiving disability benefits).

Moreover, the Merit System Board has reached the same conclusion. In *Allen, supra,* the Appellate Division approved the Merit System Board's construction of the PFRS statute to require the return of a no-longer-disabled employee to his former status. 262 *N.J.Super.* at 444, 621 *A.*2d 87. Likewise, in *In re Terebetski,* the Appellate Division affirmed the conclusion of the Merit System Board that the PFRS statute plainly requires the formerly disabled employee to be rehired. 338 *N.J.Super.* 564, 570, 770 *A.*2d 756 (App.Div.2001). Expanding on its understanding of the goals underlying *N.J.S.A.* 43:16A–8(2), the panel in *Terebetski* stated that "[t]he purpose of this legislation *is to return* the previously disabled employee to work *as if the officer had never been disabled* and the officer's service *had never been interrupted.*" *Ibid.* (emphasis added).

We take our lead from those long-standing administrative and judicial interpretations of the reexamination and reemployment provisions of those pension statutes. Those interpretations are important not only because of the deference we accord to the administrative agencies called to enforce a statutory scheme, but also because we attempt to construe statutes on the same subject as part of a harmonious whole. Indeed, when cognate laws are passed, they should be viewed as part of a consistent plan unless they are "expressly or impliedly incompatible." *Jacobs v. N.J. State Hwy. Auth.,* 54 *N.J.* 393, 401, 255 *A.*2d 266 (1969).

In this case there is additional support for that approach. Following the 1956 amendment of the TPAF statute, the Office of Governor Robert B. Meyner issued a press release that stated:

This new law brings the benefits available to teachers and janitors fully in line with those of other State and local governmental employees who are members of the Public Employees' Retirement System. The Governor expressed his belief that the benefits available to the members of these two retirement systems *should be kept parallel* hereafter.

[Press Release, Office of the Governor (July 26, 1956) (emphasis added).]

Consistent with that view, the sponsor's statement appended to the 1971 amendment noted that "[t]his legislation makes many changes in the sections of the act governing the Teachers' Pension

and Annuity Fund and it is contemplated that identical changes will be made in all of the retirement systems administered by the State on behalf of public employees." [6]  S. 2186, 194th Leg., 2d Sess. (N.J. 1971).  The statement added that the changes being made were intended to "liberalize benefits and provide for a uniform and more economical administration."  *Ibid.*  Thus, it follows that the Department of Education's interpretation of *N.J.S.A.* 18A:66–40(a), which tracks the interpretations accorded analogous provisions of other pension statutes, should be credited by us.

We are unpersuaded by the District's argument that those interpretations must be inaccurate because certain other pension statutes specifically state that when a disabled employee is capable of returning to his old job, the employee must be *"reinstated to duty."*  *N.J.S.A.* 43:7–12 (emphasis added); *see also N.J.S.A.* 43:16–2.  In our view, and contrary to the District's analysis, because the pension statutes are to be construed as part of a harmonious whole, the more specific language in *N.J.S.A.* 43:7–12 and *N.J.S.A.* 43:16–2 requiring reinstatement should be viewed as a strong clue regarding how ambiguous language in the TPAF statute should be interpreted.  Indeed, it is hard to imagine why the Legislature would have intended prison officers who are no longer disabled to be returned to their jobs but not teachers, policemen, or other public employees.

██  The District's contention that the Legislature placed a five-year limit on a disabled worker's reemployment in *N.J.S.A.* 18A:66–40(a) is equally unavailing.  There is nothing in the statute to suggest that the limit on TPAF's right to subject the disabled worker to medical scrutiny is somehow tethered to the employee's right to seek return to service upon no longer being disabled. The statute imposes no time limitation upon the no-longer-disabled

---

[6] Identical language was included in the sponsor statement accompanying Senate Bill 2203, which amended the PERS statute.  S. 2203, 194th Leg., 2d Sess. (N.J. 1971).

pensioner's entitlement to return to his job. The question of whether such a limitation would be wise, which is at the heart of the District's policy argument, is one for the Legislature. The Legislature chose to impose no time limitation, and we are without power to include a provision that the Legislature omitted. *Twp. of Brick v. Spivak*, 95 *N.J.Super.* 401, 406, 231 *A.*2d 380 (App.Div.) (holding that courts "should not assume the function of the Legislature and rewrite the law to include therein something which those charged with the legislative responsibility *might* have inserted if the matter had been called to their attention"), *aff'd*, 49 *N.J.* 400, 230 *A.*2d 503 (1967).

Furthermore, we have previously held that pension statutes are "remedial in character" and "should be liberally construed and administered in favor of the persons intended to be benefited thereby." *Geller v. N.J. Dep't of Treasury, Div. of Pensions & Annuity Fund*, 53 *N.J.* 591, 597–98, 252 *A.*2d 393 (1969) (citing 3 Eugene McQuillin, *The Law of Municipal Corporations* § 12.142 (3d ed. rev. 1963)); *see also Fiola v. N.J. Dep't of the Treasury, Div. of Pensions, Police & Firemen's Ret. Sys.*, 193 *N.J.Super.* 340, 347, 474 *A.*2d 23 (App.Div.1984) (noting pension statutes are to be liberally construed in favor of public employees); *Hillman v. Bd. of Trs., Pub. Employees' Ret. Sys.*, 109 *N.J.Super.* 449, 455, 263 *A.*2d 789 (App.Div.1970) ("Our task is to give that language a fair and practical interpretation with reference to the purposes of the retirement act. Pension statutes are to be liberally construed to effectuate their remedial intent.").

In our view, *N.J.S.A.* 18A:66–40(a), like its counterparts, is not simply an anti-fraud measure, but part and parcel of a humane and sensible scheme that allows a worker who has recovered from a disability to be assured gainful employment, assuming he remains qualified therefor. The statute balances the worker's interest with those of the employer and the public by encouraging the worker to report his rehabilitation and forgo his pension in favor of work. Under that scheme, the pension system does not continue to pay an able-bodied worker; the school district obtains the

services of a qualified teacher; and the newly rehabilitated teacher returns to being a productive member of society. In short, we agree with the Appellate Division panel in *Allen, supra,* that stated:

> It is apparent that the grant of disability retirement is conditioned on the continuation of the incapacity. If the retired employee regains the ability to perform his or her duties, the Legislature mandated that he or she be returned to the former position. The Legislature clearly recognized that individuals returning from a disability retirement are in a unique situation, plainly different from all other employees returning to active service. Their separation from employment is unlike the voluntary separation of other civil servants.
>
> [262 *N.J.Super.* at 444, 621 *A.2d* 87.]

Once Klumb was declared by TPAF to have recovered sufficiently to return to teaching, the District was not required to bump another employee or create a new position for her, but to reinstate her to the next opening in the position from which she was retired, so long as her credentials for that position remained in effect. Failing that, the District was required to make her whole for the losses she sustained when it refused to do its duty.

## VI.

That is not the end of the story, however. We agree with the District that the Commissioner's order of back pay requires further refining. First, in respect of mitigation, the pension benefits Klumb received after the point at which the District should have rehired her will require repayment to TPAF. Thus, they have no role to play as a set-off against the back pay the District owes. However, to the extent that Klumb was engaged in gainful employment during that period, as is permitted by the pension statute, *N.J.S.A.* 18A:66–40(a), that income should be set off against the District's obligation.

Second, and more importantly, although Klumb was denied an open teaching position in March 1999, as far as this record reveals she did not appeal or otherwise confront the District for over three years, finally filing a complaint in April 2002. The District could have challenged Klumb's failure to file

an action in lieu of prerogative writs within forty-five days under *Rule* 4:69–6(a), or within ninety days under *N.J.A.C.* 6A:3–1.3, but did not do so. Nonetheless, in fashioning a back-pay award, the District's waiver of those defenses does not eliminate consideration of Klumb's delay in seeking redress. It seems to us that, unless Klumb explains that three-year delay, the District should not be responsible for back pay during that period. It may. be that there is some explanation—it is simply not a part of this record. We therefore remand the case to the Commissioner for an analysis of those issues.

## VII.

The judgment of the Appellate Division is affirmed with the modifications we have imposed. The case is remanded to the Commissioner for proceedings to which we have adverted.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.