EDWARD W. FIELDS, PLAINTIFF-APPELLANT, v. JOSEPH J.
HOFFMAN, CLERK OF GLOUCESTER COUNTY,
DEFENDANT-RESPONDENT.

Argued October 21, 1986—Decided January 5, 1987.

*Joseph F. Lisa* argued the cause for appellant.

*Russell E. Paul,* First Assistant County Counsel, argued the cause for respondent (*Andrew Weber,* Gloucester County Counsel, attorney).

The opinion of the Court was delivered by

CLIFFORD, Justice.

By Order dated October 22, 1986, we permitted the name of plaintiff, Edward W. Fields, to be placed on the 1986 general election ballot as a Democratic party candidate for Borough Council in the Borough of Clayton. We issued the Order without opinion because of the need for expeditious resolution of this election dispute, inasmuch as the election was scheduled for November 4, 1986. Plaintiff's name did in fact appear on the general election ballot, and we have since been informed that plaintiff was elected to office.

This opinion sets forth the basis for our decision to permit plaintiff's name to be placed before the electorate.

I

This action was commenced by the filing of a Verified Complaint in lieu of Prerogative Writ and an Order to Show Cause, seeking a judgment directing defendant, the County Clerk of Gloucester County, to include the name of plaintiff, Edward W. Fields, on the 1986 Borough of Clayton general election ballot

as a Democrat candidate for Borough Council. The Complaint made reference to pertinent sections of the statutes dealing with nomination of candidates, *N.J.S.A.* 19:13–1 to –23, ballots, *N.J.S.A.* 19:14–1 to –35, and primary elections, *N.J.S.A.* 19:23–1 to –58, and recited the following facts, none of which (except, of course, for the import and effect of the cited statutes) is in dispute:

1.  Two seats for membership on Borough Council of the Borough of Clayton, Gloucester County, are up for election in the 1986 General Election.

2.  In the 1986 primary election, the official ballot for the Democratic party in the Borough of Clayton provided for voting for two candidates to run for those seats in the general election.

3.  One candidate, whose name appeared on the primary ballot by virtue of a petition previously filed, received 132 votes. No other name appeared on the ballot, but approximately thirty write-in votes were cast for various candidates for the other available position. No candidate received more than six votes. Two candidates, not including plaintiff, received six votes each; plaintiff received none.

4.  Pursuant to *N.J.S.A.* 19:13–14, the person receiving the highest number of votes in the primary election shall be the candidate of his party for the office to be filled, and in case more than one person is to be elected to the same office, "the persons having the highest number of votes to the extent of the number of offices to be filled" shall be the candidates of their party for such offices in the general election.

5.  *N.J.S.A.* 19:14–2.1 provides that the name of a person for whom votes are cast by write-in vote in a primary election shall not be included on the general election ballot unless he received the number of votes at least equal to the minimum number of signatures required on a petition to place on the primary ballot the name of a candidate for that office. That required minimum number is yielded by a calculation set forth in *N.J.S.A.*

19:23–8: "at least 5% in number of the total vote cast by the voters of that political party at the last preceding primary election held for the election of that party's candidates for the General Assembly."

6. In the last election in which the General Assembly was up for election, *i.e.*, 1985, 176 votes were cast in Clayton in the Democratic primary election. The formula prescribed by statute, *i.e.*, five per cent of 176, yields 8.8 as the required minimum number of signatures on a petition to place a name on the primary ballot, and hence the minimum number of primary election write-in votes required to permit one to ·have one's name placed on the general election ballot.

7. The candidate who received 132 votes in the primary election was selected as the Democratic candidate in the general election for one of the Borough Council positions; but because of the tie for second place and because none of the other candidates received at least 8.8 write-in votes, which would have entitled him automatically to be included on the general election ballot, a vacancy resulted in respect of the other position.

8. The vacancy thus created was filled by selection of plaintiff under the provisions of *N.J.S.A.* 19:13–20, which reads in part as follows:

> In the event of a vacancy, howsoever caused, among candidates nominated at primaries, which vacancy shall occur not later than the 51st day before the general election, or in the event of inability to select a candidate because of a tie vote at such primary, a candidate shall be selected in the following manner:
>
> (a) * * *
>
> (4) In the case of an office to be filled by the voters of a portion of a single county, the candidate shall be selected by those members of the county committee of the party wherein the vacancy has occurred who represent those portions of the county which are comprised in the district from which the candidate is to be elected.

On September 15, 1986, plaintiff delivered to defendant the requisite documents to fill the vacancy with the name of plaintiff. Those documents included a Report of the Meeting of the Executive Committee of the Democratic County Committee at

which plaintiff was selected "by unanimous voice vote;" a Certificate Filling Vacancy; and a Certificate of Acceptance to Fill Vacancy, executed by plaintiff. The submission of the documents accompanied plaintiff's request that defendant place his name on the general election ballot.

9. By letter dated September 16, 1986, defendant rejected plaintiff's request and refused to include his name on the general election ballot. Defendant's explanation for his refusal was that "there is no vacancy to fill" because "[n]o write-in candidate received at least nine votes at the Primary Election * * * ."

Plaintiff charges that defendant's refusal was "wrongful and contrary to law."

The trial court denied plaintiff's demand for a judgment that would require defendant to place his name on the general election ballot, and dismissed the complaint. Plaintiff's appeal to the Appellate Division was accompanied by an emergency application for summary disposition in an election matter under Rule 2:8–3(b) and Rule 1:2–5(1). The court granted the motion for summary disposition and affirmed the judgment essentially for the reasons stated by the trial court in its oral opinion. We then treated plaintiff's motion for leave to appeal as a petition for certification from a final judgment, granted the petition, heard oral argument on an expedited basis, and the following day issued our Order reversing the judgment below.

## II

The courts below took the position that the statutory provision for filling vacancies among primary nominees by party committee was not triggered in this case.

The statutory scheme first addresses the situation in which a person nominated for election to public office declines the nomination: in that event the nomination is void. See *N.J.S.A.* 19:13–16. The statutes then come to grips with the problem of

vacancies, first with a general provision and then by focusing on specific circumstances that have brought about the vacancy.

The general provision, *N.J.S.A.* 19:13–18, has been with us for more than half a century. It reads:

> When a person so declines his nomination, or if a petition or certificate of nomination, or if any nomination, be insufficient or inoperative, or if a nominee shall die, or for any reason vacate his nomination, the vacancy so occasioned may be filled in the manner outlined in the succeeding sections.

As observed in *Fiscella v. Nulton*, 22 *N.J.Super.* 367 (App.Div. 1952), "the Legislature, in employing the words 'nominee,' 'nomination' and 'vacancy,' did not define them specifically nor is there any indication that they were to be given any unusual or different meaning, as used in one provision or another." *Id.* at 375. Hence, those words should be given the meaning accorded them in "common usage." *Ibid.*

One of the "succeeding sections" to which *N.J.S.A.* 19:13–18 refers for the manner of filling vacancies is *N.J.S.A.* 19:13–20. As we have seen, *supra* at 265–266, that statute permits the committees of the affected political parties to select a candidate to fill "a vacancy, howsoever caused, among candidates nominated at primaries * * *." Which committee of the party makes the selection depends on the office in which the vacancy has occurred—that is, if the office is one to be filled by the voters of the entire state, then the candidate for that office is selected by the state committee of the political party in which the vacancy has occurred, *N.J.S.A.* 19:13–20(a)(1), whereas if, as in this case, the office is one to be filled by the voters of a single municipality, the selection is made by those members of the county committee who represent the district in which the municipality is located. *N.J.S.A.* 19:13–20(a)(4).

There is no challenge here to the process by which the "selection by committee" was made—that is, no one contends that the wrong committee acted or that the committee membership was somehow deficient. Rather, the argument centers on the fact that the process of "selection by committee" comes into play only in the event of a vacancy among primary nominees.

Defendant argues that there cannot be a "vacancy, howsoever caused, among candidates nominated at primaries," *N.J.S.A.* 19:13–20, until a candidate has in fact been nominated at a primary; that because no candidate for the second place on the general election ballot received more than six write-in votes at the primary, thereby creating a shortfall in the required minimum of 8.8 write-ins, there was no nomination; and that therefore there never existed a "nomination" as to which a "vacancy" occurred.

The courts below accepted that argument, concluding, as did the County Clerk, that because there was no "vacancy" as that term is used in the context of the applicable statutes, the county committee's selection was not authorized. The question here is whether that determination is consistent with the statutory scheme and fulfills the legislative intent. We think not.

Our reading of the statute leads us to conclude that "nomination" as used by the legislature in the vacancy provision, *N.J.S.A.* 19:13–18, was not intended to refer exclusively to the gaining of a sufficient number of votes—either write-ins or those for a candidate named by the petition process—to permit the placing of a particular candidate's name on the general election ballot. It was intended to refer as well to the process by which a name is, by the write-in process, *offered* or *proposed* for a place on the ballot. As *Fiscella, supra,* informs us, the recognized authorities include in their definitions of "nominate" the "act of suggesting or proposing a person by name as a candidate for an office." 22 *N.J.Super.* at 375, quoting *Black's Law Dictionary* (4th ed. 1951). Under *N.J.S.A.* 19:13–18 when that process is, in the language of the statute, "insufficient" or "inoperative," then a "vacancy" is "occasioned."

Although the legislature declared that an "insufficient" nomination would produce a vacancy, it did not define what it meant by "insufficient." It seems to us that one obvious illustration of an "insufficient" nomination is provided by this case: one in which voters have sought, by write-in votes, to place the name

of their candidates on the general election ballot, but have failed to produce the required minimum number of votes for one of the available positions. When no candidate has achieved that required minimum number of votes, there has been an "insufficiency" in the nomination. The legislature has said that when that circumstance exists, there is a vacancy. This view of the statute not only accords with *Fiscella*'s admonition that "nomination" should be given its common-usage meaning, but it is also supported by the legislative history. Moreover, it is in no way violative of public policy.

### III

The legislative history to which we refer is in connection with the 1981 enactment of chapter 264 of the Laws of 1981, codified at *N.J.S.A.* 19:14-2.1, the statute that specifies the minimum number of votes required before a write-in candidate at the primary election can have his name placed on the general election ballot. As we have seen, *supra* at 264–265, *N.J.S.A.* 19:14-2.1 now keys that number to the formula found in *N.J.S.A.* 19:23-8. That formula—5% of the total vote cast for that party's candidates in the last preceding General Assembly primary—is found in an amendment, produced by the Laws of 1981, chapter 164, to the last paragraph of *N.J.S.A.* 19:23-8.

The provision that each candidate nominated in a primary election by write-in must receive at least the number of write-in votes required on a nominating petition for that office was designed to "end the predominantly municipal practice of placing on a primary ballot the name of a candidate who had received only a handful of write-in votes—often only the votes of friends, family or neighbors." Press Release from the Office of Governor Byrne, August 14, 1981. Significantly for our purposes, the Governor's press release continues: "In the event a candidate from either major party does not reach the vote threshold, the county committee would select the nominee" —exactly the way the process played out in the case before us.

Although we recognize that a Governor's press release is perhaps not the most authoritative legislative history, *see Skeer v. EMK Motors, Inc.,* 187 *N.J.Super.* 465, 472 (App.Div.1982), "[c]ommunications from the executive branch may be reliable aids to legislative interpretation." *Ibid.,* citing *Department of Health v. Sol Schnoll Dressed Poultry Co.,* 102 *N.J.Super.* 172, 176–77 (App.Div.1968) (veto message); *see also* N. Singer, 2A *Sutherland Statutory Construction* § 48.05 (Sands 4th ed. 1985) ("The governor's action in approving or vetoing a bill constitutes a part of the legislative process, and the action of the governor upon a bill may be considered in determining legislative intent."). It thus seems clear that our view of the statute is the one intended by the legislature and that the statute was almost tailor-made to address the situation before us.

Moreover, we conclude that there is nothing in public policy to discourage our interpretation of the legislative scheme. True, a respectable argument can be made in the opposite direction, as so persuasively demonstrated by our dissenting colleague. We do not, however, share his apprehension that our result unreasonably expands the role of the party organization in the primary election, *post* at 275, or that it runs the danger of "afford[ing] party officials increased influence in selecting candidates for local elections," *post* at 277. Adopting for the moment the somewhat machiavellian perspective of the dissenter, we deem it highly unlikely that party officials would run the risk that a desired position on the general election ballot would actually remain open after a primary. Nor do we share his understanding of either the priorities of the primary process or the scales of values inherent in the system of party politics.

It is plain to us that the primary system accords preeminence to the high vote-getters who equal or exceed the legislatively-prescribed measure of representativeness, either by the number of names garnered on a petition or on a write-in ballot. But that preeminence does not move us to the inference that proper-

ly circumscribed participation by a political party in that system should be disfavored. On the contrary, a political party, because of its unique role in the American two-party system, "takes its character as a state agency from the duties imposed upon it by state statutes * * *." *Smith v. Allwright*, 321 *U.S.* 649, 663, 88 *L.Ed.* 987, 997 (1843). We recognize too the viewpoint that "[p]arties are instrumental in educating voters, framing issues, proposing policy, providing high calibre candidates through a system of competition, and holding government accountable to the public. This prime function is to make effective the voters' choice by channeling and reinforcing it." Note, "Primary Elections: The Real Party in Interest," 27 *Rutgers L.Rev.* 298, 303 n. 42 (1974). Moreover, "[p]reference by the party of quasi-governmental functions such as formulating policies and proposing candidates is widely regarded as indispensable to the political system." *Id.* at 303–04.

In sum, then, we are satisfied that the public interest is served by having the names of a candidate or candidates for each of the major political parties appear on the general election ballot; and when a vacancy occurs because of an "insufficiency" in the primary election nominating process, the interest in having a party candidate's name appear on the general election ballot can be vindicated only by the party committee selection process, as occurred here. There is nothing "anti-democratic" about selection by a party committee under the "vacancy" circumstances of this litigation. Indeed, the legislature could very well have concluded that the party committee selection process, resulting as it does in giving to party organizations the ultimate responsibility for nomination of a candidate running on the party line and in a strengthening of party organization generally, better represents the principles of democracy in action than does a nomination by the write-in votes of "friends, family or neighbors."

We emphasize that which by now must be obvious: our acknowledgement of the primarily legislative nature of the

electoral process. Today's exercise represents our conscientious endeavor to discern the legislature's intent. To the extent that we have misperceived that body's purpose, we are comforted by the knowledge that the legislature remains free to correct our error or to clarify its view of the pertinent statutes.

Finally, we conclude that the case of *Farley v. Mahoney*, 130 *Misc.*2d 455, 496 *N.Y.S.*2d 607 (Sup.Ct.1985), in which the failure to nominate was deemed not to result in a vacancy, furnishes little guidance in the resolution of the issue before us. At our request the parties to this appeal favored us with their respective analyses of that decision; but the New York statutory scheme in election matters so differs from New Jersey's as to give that state's judicial decisions involving those statutes only limited value in this context. *Farley* bears on the outcome here not at all.

## IV

The judgment of the Appellate Division is reversed. We have Ordered the defendant Clerk to cause plaintiff's name to be placed on the general election ballot and he has complied.

STEIN, J., dissenting.

Although this case nominally involves a question of statutory construction, the underlying issue is the power of the county committee of a political party to designate candidates for inclusion on the general election ballot. In my view, the power accorded to the county committee by the majority opinion far exceeds that contemplated by the statutes governing the conduct of elections.

The majority clearly and accurately frames the issue of statutory interpretation. In the case of elections for municipal office, the county committee of a political party in the municipality is authorized to select a replacement candidate "in the event of a vacancy * * * among candidates nominated at prima-

ries." *N.J.S.A.* 19:13–20. As explained by the majority, the question is whether there was such a "vacancy" in this case. The Gloucester County Clerk argues that only one candidate was nominated in the Democratic primary elections, and that the party's failure to nominate a second council candidate in the primary election does not create a "vacancy" to be filled by the ten members of the Democratic county committee in the Borough of Clayton.[1] The majority opinion concludes that the write-in votes, although insufficient in number to nominate a candidate in the primary election, nevertheless constituted a "nomination" leaving a "vacancy" among candidates "nominated" at the primary election.

The validity of the majority's analysis can best be measured in the context of the statutory mechanism for the selection of candidates for inclusion on the general election ballot. Except for electors of the president or vice-president, who are nominated by the political parties at their state conventions, general-election candidates for all public offices are to be nominated either directly by petition or at the primary election that precedes the general election. *N.J.S.A.* 19:13–1. Nomination by direct petition is the mechanism by which candidates who are unaffiliated with the major political parties may place their names on the general-election ballot. *N.J.S.A.* 19:13–3 to –13. An individual seeking a place on the general-election ballot as a nominee of a major political party follows a different course. These candidates must earn the advantages accruing from party designation on the general election ballot by winning the party nomination in a primary election, in which the voters are members of that political party. *N.J.S.A.* 19:23–46.

---

[1] The record does not disclose how many of the ten Democratic county committee members attended the meeting to fill the vacancy, whether a quorum was present, or the number of votes cast. The record reveals only that a meeting was held and that petitioner was selected by a "unanimous voice vote."

In *Stevenson v. Gilfert*, 13 *N.J.* 496 (1953), Justice Jacobs explained the historical background of the primary election process, attributing its establishment to widespread dissatisfaction with the prior practice of nomination by party conventions:

> In the [*Ray v.*] *Blair* [343 *U.S.* 214, 72 *S.Ct.* 654, 96 *L.Ed.* 894] case Justice Reed in viewing the matter from its national aspect, properly noted that political parties were not born with the Republic but were created by necessity; that originally nominees for public office were designated by self-appointed individuals; that this system was early succeeded by party conventions; and that because of public dissatisfaction with the political manipulation of conventions they have been largely superseded by direct party primaries. Our own state history has followed the same course. Prior to 1789 we had no statewide parties although there were county and sectional alignments. Nominations for office could readily be made by individuals and groups of individuals. However, following the first Congressional elections statewide political parties came into full being, conventions were held for the selection of party candidates, and party slates began to appear. Throughout most of the 19th Century party candidates were selected at conventions which were conducted without any state regulation whatever. In 1878 our Legislature passed its first enactments which related to party primaries and conventions. *L.* 1878, *cc.* 113, 204; *Boots, The Direct Primary in New Jersey* (1917), 15. There were later enactments and in 1898 a comprehensive revision of the election laws was adopted; they embodied only relatively minor provisions bearing upon primaries and conventions. However, in 1903 the Legislature adopted a supplement (*L.* 1903, *c.* 248), which dealt extensively with the subject and launched our now long-standing state policy of having fully regulated closed primaries. Indeed, New Jersey has been described as "one of the most tightly closed of the closed primary states." [*Id.* at 498–99 (quoting *Merriam and Overarcher, Primary Elections,* 71 (1928)).]

Our statutes governing primary elections provide for elections at public expense, with detailed requirements governing the petitions of nomination, voter registry lists, official ballots, and regulation of the primary election process to insure that only voters affiliated with the political party may vote in the primary. The statute expressly prohibits any state, county, or municipal committee of a political party from endorsing any candidates seeking that party's nomination prior to the primary election. *N.J.S.A.* 19:34–52. *See Gillen v. Sheil,* 174 *N.J.Super.* 386, 389–90 (Law Div.1980); *Cavanagh v. Morris County Democratic Comm.,* 121 *N.J.Super.* 430 (Ch.Div.1972). These statutes demonstrate

full legislative recognition that primary elections were no longer matters of private concern to be dealt with by party managers in any manner they chose but, on the contrary, were of public concern and required regulation in the public interest. [*Stevenson v. Gilfert, supra*, 13 *N.J.* at 500 (citing *Wene v. Meyner*, 13 *N.J.* 185, 192 (1953)).]

Because of the public interest in primary elections free from domination by the party hierarchy, the law requires that a primary candidate's petition for nomination be signed by a prescribed minimum number of party members. In the case of candidates for municipal office, the minimum number is 5% of the total votes cast at that party's last preceding primary election held for party candidates for the General Assembly. *N.J.S.A.* 19:23-8. The very same standard—5% of votes cast at the last primary for General Assembly candidates—prescribes the minimum number of votes that a write-in candidate in a primary election must receive in order to be the party's nominee on the general election ballot. Such legislative controls on the primary election process are obviously intended to discourage domination of the primary process by the party machinery and to encourage a broad-based participation in the primary election by party members.

The role of the party organization in the primary election is narrow indeed. In the event a vacancy occurs among candidates nominated in the statutorily-prescribed primary election process, the legislature has authorized the county committee of the party to fill the vacancy. Presumably, this concession to the party organization reflects a legislative determination that if a vacancy occurs *after* nominees have been selected in a broad-based primary election, the public interest is not then disserved if the vacancy is filled by party officials.

Against this legislative background, the majority decision's approval of candidate selection by party officials in this case, where the designated candidate is not replacing a nominee duly elected in the primary election, is plainly incompatible with the underlying purposes of the primary election law. The majority bases its support for its conclusion on two grounds. First, it

relies on a strained construction of the word "nominated" in *N.J.S.A.* 19:13–20, which authorizes party officials to select a replacement candidate "[i]n the event of a vacancy, howsoever caused, among candidates *nominated* at primaries * * *." (Emphasis added.).

> The majority concludes that the word "nominated" was not intended to refer exclusively to the gaining of a sufficient number of votes—either write-ins or those for a candidate named by the petition process—to permit the placing of a particular candidate's name on the general election ballot. It was intended to refer as well to the process by which a name is, by the write-in process, *offered* or *proposed* for a place on the ballot. [*Ante* at 268.]

Since the main purpose of the strict regulation of primary elections is to assure that the "candidates nominated at primaries" reflect the preference of the party's eligible voters, the majority's holding that a person *proposed* for a place on the ballot is the equivalent of a *nominated* candidate appears to be irreconcilable with the legislative scheme.

The other basis for the majority's conclusion is a reference in the Press Release from the Office of the Governor issued contemporaneously with the signing of chapter 264 of the Laws of 1981. As noted in the majority opinion, that statute, codified at *N.J.S.A.* 19:14–2.1, "specifies the minimum number of votes required before a write-in candidate at the primary election can have his name placed on the general election ballot." *Ante* at 269. The Press Release expresses the opinion, unattributed to any identified source, that "the county committee would select the nominee" if a candidate does not attain the requisite number of write-in votes. This observation in the Press Release was not related to the statute signed by the Governor, but rather to the interpretation of the vacancy statute first enacted some fifty years earlier. Without in any way denigrating the judgment or insight into the legislative process possessed by those who prepare press releases in the Governor's Office, it is evident that *this* press release, to the extent that it purports to interpret a fifty-year-old law, does not constitute part of the legislative history that could inform our interpretation of the

vacancy statute. At most, it may reflect the speculation of members of the Governor's staff as to the likely judicial interpretation of the vacancy statute. It clearly is entitled to little weight in the matter before us.

The danger of the result reached by the majority is that it may afford party officials increased influence in selecting candidates for local elections. Although political parties may not endorse candidates before the primary elections, party leaders frequently encourage individuals to circulate petitions and seek nomination in their party's primary election. The majority's holding suggests that the party's role in designating general-election candidates could be enhanced if no candidates are solicited to file petitions for positions on the primary ballot. As long as any candidate receives at least one write-in vote in the primary election—presumably far short of the number required—that individual's insufficient number of write-in votes would create a vacancy among "candidates nominated at primaries," triggering the power of the county committee to designate its own choice. Thus, this decision may remove the incentive for a political party to encourage individuals to participate in primary elections. Rather than run the risk of a broad-based primary in which the nominee may be hostile to the party organization, a party hierarchy can achieve the power to designate the party's nominee by the expedient casting of a handful of write-in votes in the primary election.

In my view, the majority's decision is inconsistent with the underlying objectives of our primary election laws, which seek to encourage broad participation by party members in the process by which a party's candidates for the general election are chosen. For the reasons stated, I dissent from the majority's disposition of this appeal.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—5.

*For affirmance*—Justice STEIN—1.