64 A.3d 995

FABIO COLOGNA, PETITIONER–APPELLANT, v. BOARD OF
TRUSTEES, POLICE AND FIREMEN'S RETIREMENT
SYSTEM, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 8, 2013—Decided May 1, 2013.

Before Judges PARRILLO, SABATINO and CARROLL.

*William P. Hannan* argued the cause for appellant (*Oxfeld Cohen, P.C.*, attorneys; *Sanford R. Oxfeld*, of counsel; *Mr. Hannan*, of counsel and on the brief).

*Diane J. Weeden*, Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa*, Attorney General, attorney; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Ms. Weeden*, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

In this case of first impression, we ascertain the intended meaning of *N.J.S.A.* 43:16A–3(5). This statutory provision extends to five years the usual two-year period within which a former member of the Police and Firemen's Retirement System ("PFRS") may resume employment and reinstitute his membership in the retirement system.

■ Consistent with the Governor's conditional veto message that led to the provision's amendment in 1980, we construe the five-year extended time frame as being confined to only members who lose their public employment as the result of an employer's layoff or reduction in force, or through leave of absence in accordance with the statute. Because appellant in the present case voluntarily resigned from his former employment as a police officer and was not fired, laid off, or granted leave of absence, we affirm the final agency decision of the PFRS Board of Trustees precluding reinstatement of his membership more than two years later.

I.

Police and firefighters are generally eligible to participate in the PFRS pension system. *N.J.S.A.* 43:16A–3(1). While employed in such occupations, members contribute a portion of their earnings into the pension system. *N.J.S.A.* 43:16A–15(2). Eligibility for retirement benefits in the PFRS is based upon, among other things, the member's years of service. *N.J.S.A.* 43:16A–6.

The PFRS statute identifies several events that will terminate an employee's membership in the system. For example, membership ceases if the member "withdraw[s] his aggregate contributions, or become[s] a beneficiary or die[s], or if more than 2 years have elapsed from the date of his last contributions to the system[.]" *N.J.S.A.* 43:16A–3(3). If a member resigns or is dismissed from his police or fire employment and fails to apply to return his aggregate pension contributions, the PFRS will termi-

nate his membership and hold his accrued contributions until the former member applies for a return of those funds, without interest. *N.J.S.A.* 43:16A–3(4).

The two-year reactivation deadline set forth in *N.J.S.A.* 43:16A–3(3) is qualified by the statutory provision at the crux of the present appeal, *N.J.S.A.* 43:16A–3(5). Section 3(5) provides:

> If a member of the retirement system *has been discontinued from service through no fault of his own* or through leave of absence granted by his employer or permitted by any law of this State and he has not withdrawn his accumulated deductions, his membership may continue, notwithstanding any provisions of this article *if such member returns to service within a period of 5 years* from the date of his discontinuance from service.
>
> [*N.J.S.A.* 43:16A–3(5) (emphasis added).]

The provision, which was amended to its present form by the Legislature in 1980, has not been interpreted in any published judicial opinion.

Appellant Fabio Cologna, a firefighter employed by the City of Hoboken since February 2008 and a former police officer, seeks the benefit of the five-year reinstatement period within *N.J.S.A.* 43:16A–3(5). In particular, appellant contends that his prior employment as a police officer ended in September 2005 "through no fault of his own" and that he therefore satisfies the literal terms of the statute. Respondent, the PFRS Board of Trustees, disputes appellant's construction of the statute, as well as his characterization of the events that precipitated the end of his service as a police officer.

A.

The pertinent chronology was developed at a one-day hearing before an Administrative Law Judge ("ALJ"). We summarize the aspects most relevant to our analysis.

Appellant joined the United States Marine Corps shortly following his high school graduation in 1992. During the course of his enlistment, appellant witnessed several traumatizing events, including an accident on board an aircraft carrier, as well as a fatal

auto accident involving a friend. Appellant served in the Marines for a total of six years. He was honorably discharged in 1998.

Upon leaving the Marines, appellant began working for the City of Edison in 1999. He enrolled in the Public Employees' Retirement System ("PERS") beginning in October 1, 1999, in conjunction with that municipal employment. Appellant took a leave of absence from his position with the City of Edison in 2004 to attend the Alternate Route Program. The program offers a separate avenue of attending the Police Academy, whereby, as appellant described it, "candidates pay for their own way in order to go through . . . as opposed to the municipalities incurring the costs of training an officer or paying for the insurance, the candidate does that upon himself."

Appellant graduated from the Academy in 2004. Shortly thereafter, on January 3, 2005, he began working as a police officer for the Franklin Township Police Department. Appellant resigned from his position with the City of Edison on the same day. He concurrently transferred his pension contributions from the PERS to the PFRS on January 27, 2005.

The terms of appellant's employment with Franklin Township were such that he was hired on a probationary basis for the first year. As a result, appellant acknowledged that the police department could terminate him "at any time for pretty much any reason[.]" After completing the first year, his probationary status would end, and appellant would then become a permanent employee.

Within weeks of his employment with the Franklin Township Police Department, appellant was assigned the task of handling "unattended deaths." In that particular assignment, police officers were required to attend to discovered bodies, such as persons who had died during the night. As part of these responsibilities, appellant observed corpses and waited at various locations for coroners to arrive.

Appellant also described in his testimony a separate instance where, in the course of his duties as a police officer, he had to put down a wounded animal. On that occasion, appellant encountered a mortally injured deer, and shot the animal in the head with a twelve-gauge shotgun. The blast was so forceful, appellant explained, that it almost decapitated the deer.

According to appellant, these troubling experiences on the police force caused him to relapse into prior trauma he had experienced while serving in the Marine Corps. These "flashbacks," as he explained, started compounding and hindered his performance as a probationary police officer. He began to experience anxiety, depression, forgetfulness, and nervousness, to such a severe degree that he had nightmares. As a result of these symptoms, he could not, for example, articulate the contents of radio transmissions, absorb the details on written reports, recall certain matters, and perform other activities central to his role as a police officer.

Appellant contended that his symptoms grew to such a severity that, during a particular interview with a supervisor, he "started breaking down and started crying and [he] had no idea[, he] had no control over it." According to appellant, the interviewer, an investigative officer, remarked that appellant "obviously [had] some issues that [he had] to work out before [he could] go into this line of work."

Given these problems, appellant did not complete his first year of probationary service with the Franklin Township police force, despite the fact that his supervisors had allowed him to repeat the probationary process three times. Appellant initially thought his problems at work were personal issues, and not manifestations from his traumatic experiences in the military. It was not until the last few months of his police employment, in the summer of 2005, that he sought assistance from the United States Department of Veteran Affairs ("VA"). The VA physician concluded that the cause of appellant's symptoms stemmed from Post–Traumatic Stress Disorder ("PTSD"), linked to trauma he had experienced

while in the Marine Corps. The physician consequently pre-scribed medication to appellant to alleviate appellant's symptoms.

On August 25, 2005, appellant applied to the VA for a military disability pension. He noted within his application that he was suffering symptoms stemming from PTSD. According to appellant, upon speaking with a VA representative, he began to realize that his symptoms from PTSD were related to his inability to perform tasks as a police officer.

On February 26, 2006, the VA determined that appellant was disabled, as of August 25, 2005. The VA consequently issued him retroactive federal benefits.

The Board of Trustees presented testimony at the administra-tive hearing from Detective Sergeant Gregory Borlan, a former vice president of the local police union representing employees in the Franklin Township Police Department. In that capacity, Borlan assisted fellow officers to ensure, for example, that disci-pline was administered fairly, and that those union members who needed medical assistance could receive it. Borlan indicated, however, that appellant never approached him regarding any problems in performing his duties as a police officer.

On September 6, 2005, appellant tendered a letter of resignation to the Chief of Police. The second sentence in that letter stated, "This resignation is voluntary and comes of my own free will without duress." Borlan countersigned the letter of resignation, so as "to make sure [the signature] was a voluntary resignation, not coerced." The "main goal" of his presence there, Borlan explained, was to ensure that appellant's resignation was under-taken voluntarily. In addition, a captain of the police department also countersigned appellant's letter.

Appellant began seeing a therapist in January 2006. He contin-ued treatment with the therapist as of the time of the administra-tive hearing. The therapy sessions focused on appellant's severe anxiety disorder, ultimately diagnosed as PTSD.

As a result of the treatment, appellant's confidence in his ability to work in the public sector improved. He applied for employment with the Fire Department of the City of Hoboken and was successful in completing his probationary period there. Appellant began his new position with the Hoboken Fire Department on February 20, 2008. As of the time of this appeal, appellant remains employed there. As a firefighter eligible to participate in the PFRS, appellant enrolled in the PFRS under a new membership account on March 1, 2008.

In March 2010, appellant wrote to the Division of Pensions and Benefits ("the Division") and requested the agency to continue his membership under his former PFRS account that had been established during his tenure as a probationary officer with the Franklin Township Police Department. The Division rejected that request, informing appellant that his former membership had expired because more than two years had passed since his last contribution to the account in 2005. It further instructed that appellant's return to a PFRS-eligible position consequently required his "re-enrollment into the PFRS under a new membership."

Appellant appealed that initial determination to the Board of Trustees, which referred the matter to the Office of Administrative Law ("OAL") for a hearing. The OAL hearing before the ALJ took place on June 24, 2011.

B.

After considering the parties' evidence, the ALJ adopted the agency's position to reject appellant's request to reactivate his former PFRS account. The ALJ noted in her written decision that appellant had begun working for the Franklin Township Police Department in January 2005, but that he had submitted a letter of resignation on September 6, 2005, stating that he was no longer able to "further his career in law enforcement." The ALJ further noted that on that same date, he sent a memorandum to the police chief expressing that his resignation was due to "per-

sonal issues that have come up to preclude [him] from performing the job of police officer in the Township of Franklin."

The ALJ recognized that appellant was diagnosed with PTSD, and that the symptoms he had experienced in connection with the disorder stemmed, ultimately, from his experiences as a service member in the Marine Corps from 1992 to 1998. Additionally, the ALJ recognized that events during his probationary service as a police officer in Franklin Township had exacerbated those symptoms.

It was significant to the ALJ, however, that Detective Sergeant Borlan had been present when appellant submitted his letter of resignation, and that Borlan's purpose there was "to assure that the resignation was voluntary and not the product of coercion or duress." Borlan, furthermore, spoke with appellant prior to countersigning the letter, and there was no discussion of any medical issues that appellant was experiencing.

Given these proofs, the ALJ concluded that appellant voluntarily resigned from the Franklin Township Police Department on September 6, 2005. The ALJ found that the record did not support appellant's contention that his PTSD inhibited his ability to understand the voluntariness of his resignation, nor that he was under any "meaningful duress." Consequently, the ALJ ruled that appellant was unable to reinstate his previous PFRS account. In reaching that determination, the ALJ noted that the applicable statute was unambiguous, in that membership to the pension system ended automatically upon a member's resignation.

On March 12, 2012, the Board of Trustees adopted the ALJ's findings of fact and conclusions of law in its final administrative decision. This appeal ensued.

II.

When interpreting the meaning of a statute, "our main objective is to further the Legislature's intent." *Klumb v. Bd. of Educ.*, 199 *N.J.* 14, 23, 970 *A.*2d 354 (2009) (citing *Bd. of Educ. v. Kennedy,*

196 *N.J.* 1, 12, 951 *A.*2d 987 (2008)). "[T]he best indicator of that intent is the statutory language." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citing *Frugis v. Bracigliano,* 177 *N.J.* 250, 280, 827 *A.*2d 1040 (2003)). However, if the words of a statute are open to varying interpretations, courts may look to extrinsic materials, including the statute's legislative history. *Marino v. Marino,* 200 *N.J.* 315, 329, 981 *A.*2d 855 (2009); *see also 612 Assocs., LLC v. N. Bergen Mun. Utils. Auth.,* —— *N.J.* ——, —— (2013) (slip op. at 15–16).

■ In applying these general principles to our examination of *N.J.S.A.* 43:16A–3(5), we bear in mind that pension statutes traditionally are "liberally construed and administered in favor of the persons intended to be benefited thereby." *Geller v. Dep't of Treasury,* 53 *N.J.* 591, 597–98, 252 *A.*2d 393 (1969). That said, interpretations of statutes "by agencies empowered to enforce them are given substantial deference[.]" *TAC Assocs. v. N.J. Dep't of Envtl. Prot.,* 202 *N.J.* 533, 541, 998 *A.*2d 450 (2010). Such deference has been specifically extended to state agencies that administer pension statutes. *See, e.g., Matturri v. Bd. of Trs., Judicial Ret. Sys.,* 173 *N.J.* 368, 381–82, 802 *A.*2d 496 (2002); *Bueno v. Bd. of Trs., Teachers' Pension & Annuity Fund,* 404 *N.J.Super.* 119, 125, 960 *A.*2d 787 (App.Div.2008), *certif. denied,* 199 *N.J.* 540, 973 *A.*2d 944 (2009). If, however, an agency's interpretation is plainly incorrect as a matter of law, we owe the agency no deference. *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973); *see also G.S. v. Dep't of Human Servs.,* 157 *N.J.* 161, 170, 723 *A.*2d 612 (1999).

The disputed and crucial text within the statute before us is the qualifying phrase: "[i]f a member of the retirement system *has been discontinued from service through no fault of his own* ... [.]" *N.J.S.A.* 43:16A–3(5) (emphasis added). Appellant contends that he is entitled to the benefit of the statute's so-called five-year "look-back" provision because he maintains that he left his prior employment as a police officer through "no fault of his own[.]" He argues that the statute should be read to cover him because it was

his mental condition, including his then-undiagnosed PTSD, which prompted him to resign, as his affliction stemming back from his military service made him incapable of performing the duties of a police officer.

The ALJ and the agency rejected appellant's interpretation of *N.J.S.A.* 43:16A–3(5), and so do we. Appellant's interpretation overlooks the important phrase "has been discontinued from service," which immediately precedes the phrase "through no fault of his own." *Ibid.* Notably, the phrase "has been discontinued" is written in the passive voice. As such, it connotes a situation in which an employer, here the Franklin Township Police Department, took action against an employee by discontinuing his services.

The voice of a verb within a sentence "shows whether the subject acts (active voice) or is acted on (passive voice)—that is, whether the subject performs or receives the action of the verb." *Chicago Manual of Style* § 5.112 (15th ed.2003), *quoted in State v. Marquez*, 202 *N.J.* 485, 523, 998 *A.*2d 421 (2010) (LaVecchia, J., dissenting). In the present context, the passive term "has been discontinued" within *N.J.S.A.* 43:16A–3(5) signifies that the employee in question, as the recipient of the action, has been terminated from his job as a result of the employer's own actions. Here, appellant chose himself to end his service as a police officer. His employer did not take action to remove him. Consequently, appellant has *not* "been discontinued from service" within the terms of the statute.

Moreover, we accept the ALJ's specific findings, as did the Board of Trustees, as to the volitional nature of appellant's resignation from the police force. The ALJ did acknowledge that appellant's PTSD was a "real and debilitating ailment that had a profound effect on him[.]" Even so, the ALJ reasonably concluded that appellant's PTSD did not "inhibit[ ] his ability to understand the voluntariness of his resignation" nor was his decision made "under any meaningful duress." This finding is supported by substantial credible evidence in the administrative record, and

we are therefore bound to adopt it. *Campbell v. Dep't of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *see also In re Stallworth*, 208 *N.J.* 182, 194, 26 *A.*3d 1059 (2011).

Appellant does not contend that he was coerced to resign by his police supervisors. To the contrary, he praises them for their patience and understanding of his difficult situation. By no means did they take the initiative to have appellant "discontinued from service." That conceded truth prevents appellant from taking advantage of the five-year extended reinstatement period.

Any doubts about the inapplicability of *N.J.S.A.* 43:16A–3(5)'s five-year period to the present case are dispelled by a review of the statute's legislative history. *N.J.S.A.* 43:16A–3(5) originated from a conditional veto that Governor Brendan Byrne issued in 1980, in response to concerns that a bill presented to him to amend *N.J.S.A.* 43:16A–3, Assembly Bill No. 555 ("A–555"), was "unnecessarily broad."

The sponsor of A–555, Assemblyman James Zangari, had sought to amend *N.J.S.A.* 43:16A–3(3) so that the permissible lapse in time for individuals who had failed to make pension contributions before their PFRS accounts were terminated would be extended across-the-board from two years to three. The Assemblyman was concerned that massive layoffs of police officers occurring in Newark at the time would create a hardship for such affected officers seeking to maintain their PFRS accounts in good standing. The Sponsor Statement accompanying A–555 that Assemblyman Zangari submitted to the General Assembly read as follows:

> This bill extends from 2 to 3 years the period of time which may elapse before a person may no longer be considered a member of the police and firemen retirement system due to a lapse in contributions.
>
> The bill is necessary because of the layoff of a number of police officers in the State's largest urban area. Many of these officers are waiting to be called back to duty; however, if they are dropped from the retirement system, because of lapsed contributions and are not called back until after they are over 35 years of age, they will be ineligible to rejoin the system. It is believed that the 1 year extension proposed by this bill will be sufficient to allow all those who would be [a]ffected by the recent layoffs to maintain their membership until recalled to duty.
>
> [*Sponsor's Statement, Statement to A. 555* (1980).]

On May 19, 1980, the Department of Treasury submitted excep-
tions to A–555. Among other things, the Treasurer objected to the
proposed time extension from two to three years because it would
lead to a sharp rise in costs for the State:

> Assembly Bill No. 555 extends from 2 to 3 years the period of time which may
> elapse before a person may no longer be considered a member of the police and
> firemen retirement system due to a lapse in contributions. The bill is retroactive
> in its effect to July 1, 1979.
>
> . . . .
>
> The Department of Treasury objects to the bill for the following reasons:
>
> a.  All State-administered retirement systems provide for termination of mem-
> bership if contributions have been discontinued for more than 2 years;
>
> b.  Extending the term from 2 to 3 years increases the likelihood that the
> employee will be injured in another position; he will then be able to return to
> police service and file for service or disability;
>
> c.  Increasing the period from 2 to 3 years will result in a decline in the
> withdrawal rate—with the probable effect of increasing costs: Treasury argues
> that the "chances are that it (extended leave) will be exercised by high-salaried
> rather than low-income individuals because better paid employees are more able to
> afford not to receive a return of contributions upon termination of employment."
> [*Senate County and Municipal Government Committee, Statement to A. 555* (May
> 19, 1980).]

The Treasury's objections held sway with Governor Byrne. On
September 22, 1980, the Governor issued a conditional veto to A–
555, subject to the following concerns and modifications:

> Pursuant to Article V, Section I, Paragraph 14(b) of the Constitution, I herewith
> return Assembly Bill No. 555 with my objections for reconsideration.
>
> This bill . . . is designed to assist the large number of policemen laid off in the
> City of Newark, many of whom are waiting to be called back to duty.
>
> I agree with the purpose of the bill *but find the bill as passed unnecessarily
> broad in its application. In its present form, the extension of the non-contributo-
> ry period from 2 to 3 years would apply to all members of the retirement system,
> not simply those who have been laid off.* Any member of the system could take an
> extended leave of 3 years resulting in (1) a decline in the withdrawal rate from the
> system and (2) an increase in the likelihood of injury. *Both could result in
> increased costs to the public.*
>
> *I am suggesting, therefore, amendments to the bill* parallel to provisions in the
> Public Employees' Retirement System Act and Teachers' Pension and Annuity
> Fund Law *which permit a non-contributory period of as many as 5 years but
> limit it to those members who have been laid off.*
>
> Accordingly, I recommend the following amendments to Assembly Bill No. 555:
>
> Page 2, Section 1, Line 34:  Delete "3" and insert "2"

Page 2, Section 1, after Line 44: Insert:

"(5) If a member of the retirement system has been discontinued from service through no fault of his own or through leave of absence granted by his employer or permitted by any law of this State and he has not withdrawn his accumulated deductions, his membership may continue, notwithstanding any provisions of this article if such member returns to service within a period of 5 years from the date of his discontinuance from service."

[*Governor's Veto Statement to A. 555* (Sept. 22, 1980) (emphasis added).]

On the same day, the General Assembly adopted the Governor's amendments in full. *N.J.S.A.* 43:16A–3(5) remains the same today as the Governor's proposal enacted thirty-three years ago.

This unrebutted legislative history provides a strong indication that the ultimate language contained within *N.J.S.A.* 43:16A–3(5) substantially restricted an initial legislative proposal that would have been "unnecessarily broad" in scope. The conditional veto message clearly reflects that the Governor was concerned about increased costs that the State would likely incur were the bill to become law without revision.

The adoption of a statute following a conditional veto is "strong evidence of legislative intent [because] it led directly to the legislation we are called upon to construe." *Oswin v. Shaw,* 250 *N.J.Super.* 461, 465, 595 A.2d 522 (App.Div.1991) (citing *Fields v. Hoffman,* 105 *N.J.* 262, 270, 520 A.2d 751 (1987)), *aff'd,* 129 *N.J.* 290, 609 A.2d 415 (1992), *superseded by statute on other grounds, N.J.S.A.* 39:6A–8(a); *see also Roberts v. Div. of State Police,* 191 *N.J.* 516, 521–22, 924 A.2d 550 (2007) (finding instructive the conditional veto message of the Acting Governor, which the Legislature then incorporated into the wording of the enacted bill); *N.J. Coal. of Health Care Prof'ls v. N.J. Dep't of Banking & Ins., Div. of Ins.,* 323 *N.J.Super.* 207, 238, 732 A.2d 1063 (App.Div.) (relying, in part, upon a Governor's conditional veto message as an indication of the meaning of a statute), *certif. denied,* 162 *N.J.* 485, 744 A.2d 1208 (1999). These principles support the sound interpretation of *N.J.S.A.* 43:16A–3(5) that was applied in this case by the ALJ and the Board of Trustees.

We recognize that the wording selected to carry out the intent of the Governor and the Legislature—to restrict the applicable portion of the five-year provision to workers who are laid off or removed by a reduction in force—could have been more straightforward. As the conditional veto message states, the selected text was patterned after pre-existing pension statutes that used, as of 1980, similar phraseology. *See, e.g., L.* 1966, *c.* 217, § 3 (referring, in the 1980 version of *N.J.S.A.* 43:15A–8(a), to a member of the Public Employees' Retirement System who "has been discontinued from service through no fault of his own");[1] *L.* 1967, *c.* 271, § 18A:66–8 (similarly referring, in the 1980 version of the Teachers' Pension and Annuity Fund Law, to a member's discontinuation from service "through no fault of his own").[2] Indeed, in *Lally v. Public Employees' Retirement System,* 246 *N.J.Super.* 270, 272, 587 *A.*2d 303 (App.Div.), *certif. denied,* 126 *N.J.* 332, 598 *A.*2d 890 (1991), we applied that statutory language in sustaining the PERS's denial of the extended reinstatement period to a municipal councilwoman who had not sought reelection, noting that "[s]he was not laid off, nor was her position abolished."

Although appellant's circumstances are sympathetic, he has no recourse under the statute to revive belatedly his membership in the PFRS, other than to purchase his prior service time as a police officer pursuant to *N.J.S.A.* 43:16A–11.4.

Affirmed.

---

[1] *N.J.S.A.* 43:15A–8(a) was amended in 1991 and rephrased, in pertinent part, to read "has been discontinued from service without personal fault." *L.* 1991, *c.* 138, § 6.

[2] *N.J.S.A.* 18A:66–8 was likewise amended in 1991 to read, in pertinent part, "has been discontinued from service without personal fault." *L.* 1991, *c.* 138, § 1.